## DOWS ET AL. *v.* NATIONAL EXCHANGE BANK OF MILWAUKEE.

1. An invoice is neither a bill of sale nor evidence of a sale, and, standing alone, furnishes no proof of title.
2. A party discounting a draft, and receiving therewith, deliverable to his order, a bill of lading of the goods against which the draft was drawn, acquires a special property in them, and has a complete right to hold them as security for the acceptance and payment of the draft.
3. Where such party forwarded the draft, with the bill of lading thereto attached, to an agent, with instructions, by special indorsement on the bill and by letter, to hold the wheat in the bill mentioned, against which the draft had been drawn, until payment of the draft should be made, the agent had no power, prior to such payment, to make a delivery which would divest the ownership of his principal.
4. Where the agent directed the carrying vessels, on which the wheat was shipped, to deliver it to the Corn Exchange Elevator, the proprietor whereof accepted the wheat in bailment under express instructions that it was to "be held subject to and delivered only on the payment of the draft," — *Held*, that such proprietor, although the drawee of the draft, acknowledged, by the act. of receiving the wheat, that it was not placed in his hands as the owner thereof, and that the title of the bailors was not transferred.
5. The drawee having, under such circumstances, possession of the wheat as a mere warehouseman, and not as a vendee, his subsequent sale and delivery thereof conferred no title thereto on the purchaser.
6. Where neither the evidence received nor offered tended to rebut the intent exhibited in the bills of lading, and confirmed throughout by the indorsement thereon and the written instructions, to retain the ownership of the wheat until the payment of the draft, — *Held*, that there was no necessity of submitting to the jury the question, whether there had been a change of ownership.
7. The court below properly charged the jury, that, on the refusal of the party in possession of the wheat to deliver it to the owner, when thereunto requested, the latter was entitled to recover the value thereof, with interest from the date of such refusal.

ERROR to the Circuit Court of the United States for the Southern District of New York.

This is an action of trover, instituted by the National Exchange Bank of Milwaukee to recover damages for the alleged conversion, by the plaintiffs in error, of 22,341. bushels of wheat, which the National Exchange Bank of Milwaukee claimed as its property.

The wheat was purchased in Milwaukee, Wis., by McLaren & Co., in the month of September, 1869, upon orders received

from Smith & Co. of Oswego, N.Y., who were in need of it for immediate use, and requested that the drafts on account thereof be drawn on them through the Merchants' Bank of Watertown, N.Y.   McLaren & Co. paid for the wheat so purchased, and, to reimburse themselves, shipped it on three vessels, named respectively " Kate Kelly," " Grenada," and " Corsican," and received from the captains of said vessels triplicate bills of lading, which describe McLaren & Co. as the shippers, and by their terms make the wheat deliverable to the account of W. G. Fitch, cashier, care Merchants' Bank, Watertown, N.Y. McLaren & Co. presented drafts drawn on Smith & Co., with the original bills of lading attached thereto, to the National Exchange Bank of Milwaukee.   The bank discounted them, placed the proceeds to the credit of McLaren & Co., and retained the original bills of lading.   Its cashier, after discounting the drafts, wrote a special indorsement on the back of each bill of lading.   The indorsement on that of the " Grenada " reads as follows: —

" On payment of two drafts drawn by McLaren & Co. on Smith & Co., Oswego, N.Y., to my order, dated Sept. 13, 1869, — one draft at thirty days' date for $8,000, and the other at forty-five days' date for $8,000, both drafts being payable at the Merchants' Bank, Watertown, N.Y., — you will surrender the within-mentioned wheat to Smith & Co. or order.   Should drafts above mentioned not be promptly paid, hold the wheat for my account, without recourse.

" W. G. Fitch, *Cashier*.

" Milwaukee, 13th September, 1869.

" To Merchants' Bank, Watertown, N.Y."

A similar indorsement, except as to the amounts and dates of the drafts, was made on the bills of lading of the " Kate Kelly" and the " Corsican."   McLaren & Co. insured the cargoes for their account from Milwaukee to Oswego, and transferred the insurance certificates to the bank.   After making the indorsements on the bills of lading, the cashier enclosed the drafts, bills of lading, and certificates of insurance, to the Merchants' Bank, Watertown, N.Y.   The letter enclosing those relating to the " Kate Kelly " is as follows: —

" Sept. 2.

" To Cashier Merchants' Bank, Watertown, N.Y. : —

" I hand you for collection and remittance to Mercantile National Bank, New York, for my credit, —

McLaren & Co., on Smith & Co., Oswego,  $4,080.81 exg.
"      "      Oct. 5 . . . . . . . .  7,500.00  ",
"      "      Oct. 20 . . . . . . . .  7,500.00  "

B. L. schr. ' Kate Kelly,' 8,727 bushels Amber Mil. wheat.
"             "         5,527$\frac{20}{60}$ bushels No. 1, Amber Mil.

wheat, consigned to your bank for my account, and to be held by you subject to the payment of the above drafts.

Insured North-western Nat. Ins. Co. . . .  $5,000
          Nat. Ins. Co., Boston . . . . .  5,000
          Ætna Ins. Co., Hartford . . . .  5,000
          Republic Ins. Co. . . . . . . .  5,000
          Security Ins. Co. . . . . . . .  4,000

" I consign this wheat to you, to be held as per indorsed bill of lading, and surrender only on payment of the drafts drawn against it, holding you responsible for the same in case of non-payment of the drafts. Will you receive consignments in this way, charging reasonably for the same ?

" Yours truly,        " W. G. Fitch, Cashier."

On the 6th of September, 1869, J. F. Moffatt, cashier of the Merchants' Bank, acknowledged the receipt of the letter and its enclosures.

On the 8th of that month Fitch addressed another letter, as follows : —

" To Merchants' Bank of Watertown, N.Y. : —

" In my letter of the 2d, I requested you to state in your letter whether you would hold all wheat I consign to you strictly for my account, holding your bank responsible for the safe keeping of the property for this bank, and holding such property subject to my orders in all cases where the drafts made against it are not paid. Your reply of the 6th instant does not answer my inquiry. Will you please write me by return mail, defining your position ? We have adopted the invariable rule, to in no instance consign property only on condition that the consignee acknowledges himself responsible for it, until instructed to hand over to a third party.

" Very respectfully,        " W. G. Fitch, Cashier."

In Moffatt's answer of the 11th, he says, " In reply to yours of the 2d instant, I would say that we will receive, until further notice, such consignments as you choose to send us, holding us responsible for the grain in case of non-payments of drafts, and shall charge ⅜ per cent commissions for so doing." On the 13th he acknowledged the receipt of Fitch's letter of the 8th, and said, " I believe your inquiry was answered in mine of the 11th instant."

Letters, in substantially the same language as that of Sept. 2, were written to the cashier of the Merchants' Bank, enclosing the drafts, bills of lading, and certificates of insurance, of the cargoes of the " Grenada " and " Corsican."

The cashier of the Merchants' Bank, upon receipt of the drafts and bill of lading of the " Kate Kelly," wrote three letters, — one to Smith & Co., dated Watertown, N.Y., Sept. 6, 1869, as follows : —

" Please find enclosed for acceptance, and return the following ; to wit : —

McLaren & Co., on your st. . . . . . $4,080.81 and exg.
  ".      "      Oct. 5 . . . . . 7,500.00      "
  "      "      Oct. 20 . . . . . 7,500.00      "

Also inspection certificate."

Another, bearing the same date, as follows : —

" Proprietors of Corn Exchange Elevator, Oswego, N.Y. : —

" Please find enclosed an order for cargo schooner ' Kate Kelly ' for 8,727 bushels Amber Milwaukee wheat, and 5,527$\frac{2\,0}{6\,0}$ bushels No. 1 Amber Milwaukee wheat, to be delivered to you ; and you will please hold the same subject to, and deliver the grain only on payment of, the following drafts ; to wit : —

McLaren & Co., on Smith & Co., st.   . $4,080.81 and exg.
  "      "      Oct. 5  . . . . . 7,500.00      "
  "      "      Oct. 20  . . . . . 7,500.00      "

And the third, of the same date, as follows : —

" Merchants' Bank, Watertown, N.Y., Sept. 6, 1869.
" Robert Hayes, Esq., Master schr. ' Kate Kelly,' Oswego, N.Y. : —
" Please deliver to the Corn Exchange Elevator, Oswego, N.Y., your cargo, 8,727 bushels of Amber Milwaukee wheat, and 5,527$\frac{2\,0}{6\,0}$ bushels of No. 1 Amber Milwaukee wheat, consigned to us by W. G. Fitch, Esq., cashier."

Letters of the same purport were written in relation to the cargoes of the "Grenada" and "Corsican," except that, in the case of the "Corsican," the letter enclosing the order to the master of that vessel to deliver her cargo was addressed to "Smith & Co., Proprietors Corn Exchange Elevator." Smith & Co., on the receipt of the letters, paid each of the sight drafts, and returned the time drafts, accepted, to the Merchants' Bank, without objection, and without expressing any dissent to the terms and conditions upon which the wheat was to be delivered, on its arrival, to the Corn Exchange Elevator. The sight drafts were paid, and the time drafts accepted, several days before the arrival of the cargoes at Oswego.

McLaren & Co. forwarded to Smith & Co. invoices of the purchases, with statement of account for disbursements and commissions. The invoice of the "Kate Kelly" is headed, "Account purchase of 14,250$\frac{20}{60}$ bushels wheat, bought for account, and by order of Smith & Co., Oswego, N.Y., through McLaren & Co." Those of the "Grenada" and of the "Corsican" respectively differ from it only in the number of bushels. No bill of lading for either cargo was sent to Smith & Co.

The "Kate Kelly" arrived in Oswego Sept. 16, 1869. Her cargo was discharged into the Corn Exchange Elevator. Seven thousand three hundred bushels were "spouted" direct from the vessel through the elevator into the canal-boat "Frank Alvord," and other quantities into the south, middle, and north team bins; the balance of the cargo went into numbered bins; and 3,047$\frac{10}{60}$ bushels was, on the 18th September, shipped into the canal-boat "Four Sisters," and a bill of lading, dated Sept. 18, 1869, signed by G. A. Bennett, was delivered to Smith & Co. The canal-boat arrived in New York Oct. 9, 1869. Smith & Co. paid the time draft of $7,500, drawn at thirty days. The time draft of $7,500, drawn at forty-five days, was unpaid at the date of this shipment.

The "Grenada" arrived with her cargo on the twenty-fourth day of September, 1860. Two thousand bushels were "spouted" into the boat "Caribbean;" and on the 27th September, 1869, 7,100 bushels were shipped into the canal-boat "B. Hagaman" by Smith & Co., and a bill of lading of that date, signed by G. A. Bennett, was delivered to them. This

canal-boat arrived in New York Oct. 27, 1869. The two time drafts drawn on the cargo of the "Grenada" were unpaid at the date of this shipment.

The "Corsican" arrived with her cargo on the 8th October, 1869; and on the same day Smith & Co. shipped 4,358 bushels of it into the canal-boat "Anna Rebecca," and 7,836 bushels of it into the canal-boat "George Ames," and received bills of lading therefor. These canal-boats arrived in New York on the 4th November, 1869. The time drafts drawn on the cargo of the "Corsican" were not paid at the time of these shipments. The drawees of the drafts were the proprietors of the Corn Exchange Elevator.

The captains of the "Kate Kelly," "Grenada," and "Corsican," on their arrival at Oswego, called at the office of the Corn Exchange Elevator, and there found and received from Smith & Co., before delivering their cargoes, the orders which had been sent for them, in the letters written by the cashier of the Merchants' Bank to the "Proprietors Corn Exchange Elevator," and to "Smith & Co., Proprietors Corn Exchange Elevator." The latter paid the freight on the cargoes, and receipted therefor on the back of the bills of lading retained by the captains.

The shipments by Smith & Co. were made without the knowledge or consent of the officers of the Merchants' Bank.

There was no mixture in the elevator of the cargoes of the "Kate Kelly," "Grenada," or "Corsican."

Smith & Co., on receiving the canal-boat bills of lading, sent the same, with drafts attached, through banks in New York City, to Dows & Co., the plaintiffs in error. They paid the drafts, and received the bills of lading.

All of the time drafts drawn by McLaren & Co. on Smith & Co. (except the thirty-day draft on the cargo of the "Kate Kelly"), being unpaid, were, with the original bills of lading and certificates of insurance, returned by the Merchants' Bank to the Milwaukee bank. The latter having been advised in October that the wheat had been shipped by Smith & Co., William P. McLaren, a member of the firm of McLaren & Co., went to Oswego to look after it. He was there from about the 20th to the 25th of that month, and, on examination, found no wheat in the elevator. Having ascer-

tained on the 22d that portions of the cargoes had been shipped to Dows & Co., a telegram was sent to and received by them on that day, notifying them that the wheat shipped on the canal-boats "Four Sisters," "B. Hagaman," "George Ames," and "Anna Rebecca," was the property of the National Exchange Bank of Milwaukee. The following day, parties interested in the wheat called on Dows & Co., who agreed, that, if no attempt was made to stop the wheat on the canal, it should, on its arrival in New York, be kept separate; that the Milwaukee bank should be notified of its arrival; and that they (Dows & Co.) would identify it as the wheat coming out of the said canal-boats, and would only require proof of the identity of the wheat in the canal-boats at Oswego.

On the arrival of the wheat, a formal demand in writing therefor was made on Dows & Co. by the Milwaukee bank. They refused to deliver it unless they were reimbursed the amount of their advances to Smith & Co., and freight and charges, and unless the Milwaukee bank would take care of an order given by Smith & Co. to Norris Winslow on them for any margins in their hands due Smith & Co.

The jury found a verdict in favor of the plaintiff for $31,111.51.

Judgment was rendered therefor: whereupon the defendants sued out this writ of error.

*Mr. C. Van Santvoord* for the plaintiffs in error.

The transmission of the invoice on the shipment to the consignment of the Merchants' Bank, on their acceptance of the terms and conditions of the contract, was, by the acts of both parties, an appropriation of the wheat shipped to the use of Smith & Co., which passed the property. *Richardson* v. *Dunn*, 2 Ad. & E. N. s. 217; *Alexander* v. *Gardner*, 1 Bing. N. C. 671.

This invoice, which has the strength of a bill of sale, was documentary evidence of title placed in the hands of Smith & Co. as the purchasers. Their right in the wheat shipped upon acceptance and payment of the sight and acceptance of the time drafts as noted in the invoice was thereby acknowledged: they were thus furnished with the means of asserting that right, and authorized to receive the wheat on delivery through the

Merchants' Bank for their own account. *The Merrimack*, 8 Cr. 318, 329, 330.

Conceding that this property of Smith & Co. was subject to a possessory right or legal title, and right of possession, acquired by the plaintiff by the delivery to it of the bills of lading for the wheat, with the drafts attached, on its discounting them, that right or title, with the right of possession, was transferred to the Merchants' Bank on transmission and delivery of the bill of lading to it, in furtherance of the arrangement that the property should go forward to it, as the consignee named by Smith & Co., for delivery to them. Upon its agreement that it would be responsible for the wheat if the drafts were not paid, it had the legal title, and right of possession, in trust for Smith & Co. as the general owners. The plaintiff, having neither a general nor special property in the wheat, can, therefore, not recover in an action of trover. 1 Ch. Pl. 7 Am. ed. 170; 2 Saund. 47 A, n. 1; Brown on Actions at Law, 426; *Dillenback* v. *Jerome*, 7 Cow. 294; *Hotchkiss* v. *McVicar*, 12 Johns. 403.

The transmission and delivery of a bill of lading to the consignee, or the indorsement of it for a valuable consideration, without notice to the consignee or indorsee of any title better than that of the consignor or indorsor, passes the property. *Dows* v. *Rush*, 28 Barb. 158; *Dows* v. *Greene*, 24 N. Y. 638; *Wilmshurst* v. *Bowker*, 7 Man. & G. 882.

The transfer and delivery of the bill of lading by the plaintiff, in consideration of the absolute agreement of the Merchants' Bank to be responsible for the wheat if the drafts were not paid, effectually passed the possessory right, or legal title and right of possession, to that bank. The instructions by indorsement on the bill, and by letter respecting the disposition of the wheat after the title had passed, had no operation except as matter of contract or condition subsequent. They could not affect the property. It had previously thereto vested.

If a draft, drawn on a shipment, and payable a certain number of days after sight, is sold with the bill of lading appended to it, the holder can, in the absence of proof of any local usage to the contrary, or of the imminent insolvency of the drawee, only require the latter to accept it on the delivery of the bill of lading. *Lamphear* v. *Blossom*, 1 La. Ann. Rep. 148. This

doctrine, in its application to a case where the bill, taken to the order of the consignee, is to go forward, and is transmitted to the consignee designated by the purchaser in the arrangement for the purchase, stands upon the plain obligation of the contract, however it may be when the bill is taken to shipper's order on the shipment, and is indorsed to the purchaser of the draft.

*The Constantia*, 4 C. Rob., is a direct authority, that, in the stage of the transit, such instructions as were indorsed on these bills are unauthorized, except as a means of exercising the right of stoppage *in transitu* in case of insolvency.

When the owner of property or goods, or choses in action, not negotiable, confers upon another only an apparent title or power of disposition over it, he is estopped from asserting his title as against an innocent third party who has dealt with the apparent owner in reference thereto, without knowledge of the claim of the true owner. *McNeil* v. *The Tenth National Bank*, 46 N. Y. 325; *Moore* v. *Metropolitan Bank*, 55 id. 41; *Pickering* v. *Buske*, 15 East, 38.

The claim of the defendants to protection stands on ground as strong as, if not stronger than, that of a *bona fide* purchaser from a mortgagor in possession of merchandise with power of control under an unrecorded mortgage, as in *Thompson* v. *Blanchard*, 4 Coms. 303; or of a *bona fide* purchaser from a vendee in possession obtained by fraud, as in *Paddon* v. *Taylor*, 44 N. Y. 371; *Rawle* v. *Deshler*, 3 Keyes, 575; s. c. 28 How. Pr. 66; *Griswold* v. *Sheldon*, 4 Coms. 581; *Edgell* v. *Hart*, 5 Seld. 213; *Ford* v. *Williams*, 24 N. Y. 359; 3 R. S. N. Y., 5 ed. 222, sects. 9, 10; Com. Dig. Covin (A), (B 1), (B 3); Vin. Abr. Fraud, L.

Smith & Co. were in possession of the correspondence containing the contract for the purchase for their immediate use, and on a credit, and the invoice with the letters enclosing them, showing a purchase and shipment of wheat for their account, with no other condition than the acceptance or payment of the sight and the acceptance of the time drafts. Knowing that it was shipped under their arrangement with McLaren & Co. for delivery to them through the Merchants' Bank as their bank, and under the agreement of that bank to be

responsible for it if the drafts were not paid, they might conclude that these instructions, of which they were notified, were unauthorized, or were intended either to secure the appropriation of the proceeds in payment of the drafts, or to secure the responsibility of the Merchants' Bank to plaintiff. Its engagement so to be responsible was made in reliance upon Smith & Co.'s responsibility. But certainly no one of mercantile education or ordinary sagacity, in their situation, would, under the circumstances, infer that the intention was that the wheat should be held according to the literal import of these instructions until the time drafts matured and were paid; for this would defeat the very object and purpose of the purchase and consignment for their immediate use.

The effect of the documentary evidence relied on by the plaintiff depending on collateral facts *in pais* and extrinsic circumstances, the inferences from them should have been drawn by the jury. *Etting* v. *Bank of the U. S.*, 11 Whart. 59; *Richardson* v. *Boston*, 19 How. 263; *Railroad* v. *Stout*, 17 Wall. 657; *Brown* v. *McGrau*, 14 Pet. 479; *Barreda* v. *Silsbee*, 21 How. 147.

*Mr. H. M. Finch* for the defendant in error.

By the transactions between McLaren & Co. and the National Exchange Bank of Milwaukee, the title to the wheat became vested in that bank. *The Aurora*, 4 C. Robinson, 218; *The Frances*, 8 Cran. 354, 418, 9 id. 183; *The Merrimack*, 8 id. 317; *The San Jose Indians*, 1 Wheat. 208; *Seymour* v. *Newton*, 105 Mass. 273; *Cayuga Bank* v. *Daniels*, 47 N. Y. 632; *Turner* v. *Trustees Liverpool Docks*, 6 Exch. 543; *Ward* v. *Taylor*, 6 Ill. 494; *Shepard* v. *Harrison*, L. R. 4 Q. B. 195; *Bailey* v. *Hudson R.R. Co.*, 49 N. Y. 75; *Tilden* v. *Minor et al.*, 45 Vt. 96; *Wait* v. *Baker*, 2 Exch. 1; *Jenkins* v. *Usborne*, 49 Eng. Com. Law, 698; *Williams* v. *Littlefield*, 12 Wend. 362; *Moakes* v. *Nicolson*, 115 Eng. Com. Law, 296; *Ellershaw* v. *Magniac*, 6 Exch. 570; *Jenkins* v. *Brown*, 68 Eng. Com. Law, 495; *Brandt* v. *Bowlby*, 2 B. & Ald. 632; *The Thames*, 14 Wall. 98; *City Bank* v. *R. W. & O. R. Co.*, 44 N. Y. 136; *Marine Bank* v. *Wright*, 48 id. 1; *Dent* v. *N. A. Steamship Co.*, 49 id. 391; *De Wolf* v. *Gardiner*, 12 Cush. 19.

The Merchants' Bank was a special agent for a specific pur-

pose, and clóthed only with limited powers to do a particular act with certain parties expressly named. Its acts, beyond the scope of its delegated authority, would not have bound its principal. *Russell* v. *Minor,* 22 Wend. 659; *Lyon* v. *Kent,* 45 Ala. 664; *Wooster* v. *Sherwood,* 25 N. Y. 287; *Wilson* v. *Nason,* 4 Bosw. 155; *Parsons* v. *Webb,* 8 Me. 38; *Conan* v. *Adams,* 10 id. 374–380; *Hodge* v. *Coombs,* 1 Black, 192; *Doubleday* v. *Kress,* 50 N. Y. 410.

The Merchants' Bank had an undoubted legal right to select the Corn Exchange Elevator as the warehouse in which to store the wheat until the maturity of the time drafts. *Kimberly* v. *Patchin,* 19 N. Y. 330; *Burton* v. *Curyea,* 41 Ill. 320; *Gibson* v. *Stevens,* 8 How. 384; *Thayer* v. *Dwight,* 104 Mass. 257; *Wooster* v. *Sherwood, supra; Hamilton* v. *Bell,* 10 Exch. 544; *Whitefield* v. *Brand,* 16 M. & W. 282; *Lickbarrow* v. *Mason,* 1 Sm. L. C. pt. 2, 1039; *Coggill* v. *H. & N. H. R. Co.,* 3 Gray, 545; *Couse* v. *Tregent,* 11 Mich. 65; *Dehon* v. *Bigelow,* 8 Gray, 159; *Brown* v. *Haynes,* 52 Me. 578; *Hotchkis* v. *Hunt,* 49 id. 213; *Parmlee* v. *Catherwood,* 36 Mo. 479; *Ulmann* v. *Barnard,* 7 Gray, 554; *Miller* v. *Stevens,* 100 Mass. 518; *Hirschen* v. *Cunney,* 98 id. 150; *Herring* v. *Hoppock,* 15 N. Y. 409; *Palmer* v. *Hand,* 13 Johns. 434; *Cragin* v. *Coe,* 29 Conn. 52; *Ballard* v. *Burgett,* 47 Barb. 646; *Kimball* v. *Jackman,* 42 N. H. 242; *Fisk* v. *Ewen,* 46 id. 173; *Buckmaster* v. *Smith,* 22 Vt. 203; *Holmark* v. *Malin,* 5 Coldw. 482; *Moakes* v. *Nicholson,* 115 Eng. Com. Law, 290; *Hunter* v. *Warner,* 1 Wis. 141; *Ballard* v. *Burgett,* 40 N. Y. 314; *Austin* v. *Dye,* 46 id. 500; *McGoldrick* v. *Willits,* 52 id. 318; *Clark* v. *Well,* 45 Vt. 4; *Brook* v. *Hook,* L. R. 6 Exch. 93; *Ranny* v. *Higby,* 5 Wis. 70; *Esser* v. *Lindermann,* 71 Penn. 80; *United States* v. *Shaw,* 1 Cliff. 321.

The letters of the Merchants' Bank, and the orders to the captains of the lake-vessels, clearly show that the wheat was to be delivered to the Corn Exchange Elevator for the account of William G. Fitch, cashier, subject to the order of the Merchants' Bank. No title to the wheat vested in the proprietors of the elevator beyond that of warehousemen; and the plaintiffs in error, therefore, acquired no property, right, or claim, under their purchase. *McNeil* v. *Tenth National Bank,* 46 N. Y. 329; *Taylor* v. *Pope,* 5 Cold. 416; *McGoldrick* v. *Willits,* 52 N. Y.

318; *Wright* v. *Ames*, 2 Keyes, 221; *Ballard* v. *Burgett*, 40 N. Y. 314; *Austin* v. *Dye*, 46 id. 502; *Fawcett* v. *Osborn*, 32 Ill. 411; *Linen* v. *Cruger*, 40 Barb. 636; *Saltus* v. *Everett*, 20 Wend. 275; *Spraights* v. *Hawley*, 39 N. Y. 441; *Cork* v. *Beale*, 1 Bosw. 497; *Williams* v. *Aberle*, 11 Wend. 80; *Evans* v. *Wells*, 22 id. 324; *Andrews* v. *Dietrich*, 14 id. 31; *McMahon* v. *Jones*, 12 Penn. 229; *Bailey* v. *Shaw*, 24 N. H. 297; *Brown* v. *Wilmerding*, 5 Duer, 225; *Anderson* v. *Nichols*, 5 Bosw. 129; *Wooster* v. *Sherwood*, 25 N. Y. 286; *Warner* v. *Martin*, 11 How. 209; *Leckey* v. *McDermott*, 8 S. & R. 500; *Stanly* v. *Gaylord*, 1 Cush. 228; *Hotchkis* v. *Hunt*, 49 Me. 213; *Roland* v. *Gundy*, 5 Ohio, 127; *Strahan* v. *Union S. T. & T. Co.*, 43 Ill. 424; *Burton* v. *Curyea*, 41 id. 320; *Hartop* v. *Hoore*, 2 Stra. 1187; *Taylor et als.* v. *Taylor et als.*, 5 Coldw. 413; *Lehigh Co.* v. *Field*, 8 S. & R. 232.

MR. JUSTICE STRONG delivered the opinion of the court.

The verdict of the jury having established that the wheat came to the possession of the defendants below (now plaintiffs in error), and that there was a conversion, there is really no controversy respecting any other fact in this case than whether the ownership of the plaintiffs had been divested before the conversion. The evidence bearing upon the transmission of the title was contained mainly in written instruments, the legal effect of which was for the court; and, so far as there was evidence outside of these instruments, it was either uncontradicted, or it had no bearing upon the construction to be given to them. We have, therefore, only to inquire to whom the wheat belonged when it came to the hands of the defendants, and when they refused to surrender it at the demand of the plaintiff.

It is not open to question that McLaren & Co., having purchased it at Milwaukee and paid for it with their own money, became its owners. Though they had received orders from Smith & Co. to buy wheat for them, and to ship it, they had not been supplied with funds for the purpose, nor had they assumed to contract with those from whom they purchased on behalf of their correspondents. They were under no obligation to give up their title or the possession on any terms other than such as they might dictate. If, after their purchase, they had

sold the wheat to any person living in Milwaukee or elsewhere, other than Smith & Co., no doubt their vendee would have succeeded to the ownership. Nothing in any agency for Smith & Co. would have prevented it. This we do not understand to be controverted. Having, then, acquired the absolute ownership, McLaren & Co. had the complete power of disposition; and there is no pretence that they directly transmitted their ownership to Smith & Co. They doubtless expected that firm to become purchasers from them. They bought from their vendors with that expectation. Accordingly, they drew drafts for the price; but they never agreed to deliver the wheat to the drawees, unless upon the condition that the drafts should be accepted and paid. They shipped it; but they did not consign it to Smith & Co., and they sent to that firm no bills of lading: on the contrary, they consigned the wheat to the cashier of the Milwaukee bank, and handed over to that bank the bills of lading as a security for the drafts drawn against it, — drafts which the bank purchased. It is true, they sent invoices. That, however, is of no significance by itself. The position taken on behalf of the defendants, that the transmission of the invoices passed the property in the wheat without the acceptance and payment of the drafts drawn against it, is utterly untenable. An invoice is not a bill of sale, nor is it evidence of a sale. It is a mere detailed statement of the nature, quantity, and cost or price of the things invoiced, and it is as appropriate to a bailment as it is to a sale. It does not of itself necessarily indicate to whom the things are sent, or even that they have been sent at all. Hence, standing alone, it is never regarded as evidence of title. It seems unnecessary to refer to authorities to sustain this position. Reference may, however, be made to *Shepherd* v. *Harrison*, Law Rep. 4, Ap. Cas. 116, and *Newcomb* v. *The Boston & Lowell R.R. Co.*, 115 Mass. 230. In these and in many other cases it has been regarded as of no importance that an invoice was sent by the shipper to the drawee of the drafts drawn against the shipment, even when the goods were described as bought and shipped on account of and at the risk of the drawee.

It follows that McLaren & Co. remained the owners of the wheat, notwithstanding their transmission of the invoices to

Smith & Co.   As owners, then, they had a right to transfer it
to the plaintiff as a security for the acceptance and payment
of their drafts drawn against it.   This they did by taking
bills of lading deliverable to the cashier of the plaintiff, and
handing them over with the drafts when the latter were dis-
counted.   These bills of lading unexplained are almost con-
clusive proof of an intention to reserve to the shipper the *jus
disponendi*, and prevent the property in the wheat from passing
to the drawees of the drafts.   Such is the rule of interpretation
as stated in Benjamin on Sales, 306; and in support of it he
cites numerous authorities, to only one of which we make
special reference, — *Jenkyns* v. *Brown*, 14 Q. B. 496.   There it
appeared that the plaintiff was a commission merchant, living
in London, and employing Klingender & Co. as his agents at
New Orleans.   The agents purchased for the plaintiff a cargo
of corn, paying for it with their own money.   They then drew
upon him at thirty days' sight, stating in the body of the drafts
that they were to be placed to the account of the corn.   These
drafts they sold, handing over to the purchaser with them the
bills of lading, which were made deliverable to the order of
Klingender & Co., the agents; and they sent invoices and a
letter of advice to the plaintiff, informing him that the cargo
was bought and shipped on his account.   On this state of facts,
the court ruled that the property did not pass to the plaintiff;
that the taking of a bill of lading by Klingender & Co., de-
liverable to their own order, was nearly conclusive evidence
that they did not intend to pass the property in the corn; and
that, by indorsing the bills of lading to the buyer of the bills
of exchange, they had conveyed to him a special property in the
cargo, so that the plaintiff's right to the corn could not arise
until the bills of exchange were paid by him.   That such is
the legal effect of a bill of lading taken deliverable to the
shipper's own order, that it is inconsistent with an intention
to pass the ownership of the cargo to the person on whose ac-
count it may have been purchased, *even when the shipment has
been made in the vessel of the drawee of the drafts against the
cargo*, has been repeatedly decided.   *Turner* v. *The Trustees of
the Liverpool Docks*, 6 Exch. 543; *Schorman* v. *Railway Co.*,
Law Rep., 2 Ch. Ap. 336; *Ellerslaw* v. *Magniac*, 6 Exch. 570.

In the present case the wheat was not shipped on the vessels of Smith & Co., and the bills of lading stipulated for deliveries to the cashier of the Milwaukee bank. When, therefore, the drafts against the wheat were discounted by that bank, and the bills of lading were handed over with the drafts as security, the bank became the owner of the wheat, and had a complete right to maintain it until payment. The ownership of McLaren & Co. was transmitted to it, and it succeeded to their power of disposition. That the bank never consented to part with its ownership thus acquired, so long as the drafts it had discounted remained unpaid, is rendered certain by the uncontradicted written evidence. It sent the drafts, with the bills of lading attached, to the Merchants' Bank, Watertown, accompanied with the most positive instructions, by letter and by indorsement on the bills, to hold the wheat until the drafts were paid; and when, subsequently, the Merchants' Bank sent orders to the masters of the carrying vessels to deliver it to the "Corn Exchange Elevator, Oswego, N. Y.," they accompanied the orders with letters to Smith & Co., the proprietors of the elevator, containing clear instructions to hold the grain, and "deliver" it only on payment of the drafts. To these instructions Smith & Co. made no objection. Now, as it is certain that whether the property in the wheat passed to Smith & Co. or not depends upon the answer which must be given to the question whether it was intended by McLaren & Co., or by the Milwaukee bank, their successors in ownership, that it should pass before payment of the drafts, where can there be any room for doubt? What is there upon which to base an inference that it was intended Smith & Co. should become immediate owners of the wheat, and be clothed with a right to dispose of it at once? Such an inference is forbidden, as we have already said, by the bills of lading made deliverable to W. G. Fitch, cashier of the Milwaukee bank; and it is inadmissible, in view of the express orders given by that bank to their special agents, the Merchants' Bank at Watertown, directing them to hold the wheat subject to the payment of the drafts drawn against it. No intent to vest immediate ownership in the drawees of the drafts can be implied in the face of these express arrangements and positive orders to the contrary. It is true that Smith &

Co. were the proprietors of the Corn Exchange Elevator, and that the wheat was handed over to the "custody of the elevator" at the direction of the Merchants' Bank; but it cannot be claimed that that was a delivery to the drawees under and in pursuance of their contract to purchase. The Merchants' Bank, having been only special agents of the owners, had no power to make such a delivery as would divest the ownership of their principals. *Stollenwerck et al. v. Thatcher,* 115 Mass. 124. And they made no attempt to divest that ownership. They guardedly retained the *jus disponendi.* Concurrently with their directions that the wheat should be delivered to the elevator, in the very orders for the delivery, they stated that the cargoes were for the account of W. G. Fitch, cashier, and were to be held subject to their order. By accompanying letters to the proprietors of the elevator, they stated that the cargoes were delivered to them " to be held subject to and delivered only on payment of the drafts drawn by McLaren & Co." All this contemplated a subsequent delivery, — a delivery after the receipt of the grain in the elevator, and when the drafts should be paid. It negatives directly the possibility that the delivery into the elevator was intended as a consummation of the purchase, or as giving title to the purchasers. It was a clear case of bailment, utterly inconsistent with the idea of ownership in the bailees. A man cannot hold as bailee for himself. By the act of accepting goods in bailment, he acknowledges a right or title in the bailor. When, therefore, as was said in the court below, " the proprietors of the Corn Exchange Elevator, or Smith & Co., received the wheat under the instructions of the Merchants' Bank, they received it with the knowledge that the delivery to them was not absolute; that it was not placed in their hands as owners, and that they were not thereby to acquire title." They were informed that the holders of the drafts, and bills of lading, had no intention to let go their ownership so long as the drafts remained unpaid. The possession they had, therefore, was not their possession. It belonged to their bailors; and they were mere warehousemen, and not vendees.

We agree, that where a bill of lading has been taken containing a stipulation that the goods shipped shall be delivered to the order of the shipper, or to some person designated by him

other than the one on whose account they have been shipped, the inference that it was not intended the property in the goods should pass, except by subsequent order of the person holding the bill, may be rebutted, though it is held to be almost conclusive; and we agree, that where there are circumstances pointing both ways, some indicating an intent to pass the ownership immediately, notwithstanding the bill of lading, in other words, where there is any thing to rebut the effect of the bill, it becomes a question for the jury, whether the property has passed. Such was the case of *Ogg* v. *Shuter*, 10 Law Rep. C. P. 159. There the ordinary effect of a bill of lading deliverable to the shipper's order was held to be rebutted by the court sitting with power to draw inferences of fact. The delivery to the carrier was " free on board," and the bill of lading was sent to the consignor's agent. The goods were also delivered into the purchaser's bags, and there was a part payment. But in this case there are no circumstances to rebut the intent to retain ownership exhibited in the bills of lading, and confirmed throughout by the indorsements on the bills, and by the written instructions to hold the wheat till payment of the drafts. Nothing in the evidence received or offered tended to show any other intent. Hence there was no necessity of submitting to the jury the question, whether there was a change of ownership. That would have been an invitation to find a fact of which there was no evidence. The circumstances as relied upon by the plaintiffs in error, as tending to show that the property vested in Smith & Co., cannot have the significance attributed to them.

It is certainly immaterial that the wheat was consigned to W. G. Fitch, cashier, care of the Merchants' Bank, Watertown, and that it was thus consigned at the request of Smith & Co., made to McLaren & Co. Had it been consigned directly to that bank, and had there been no reservation of the *jus disponendi* accompanying the consignment, the case might have been different. Then an intent to deliver to the purchasers might possibly have been presumed; but, as the case was, no room was left for such a presumption. The express direction to hold the wheat for the payment of the drafts, and to deliver it only on payment, removes the possibility of any presumed intent to

deliver it while the drafts remained unpaid. A shipment on the purchaser's own vessel is ordinarily held to pass the property to the purchaser; but not so if the bill of lading exhibits a contrary intent, — if thereby the shipper reserves to himself or to his assigns the dominion over the goods shipped. *Turner* v. *The Trustees of the Liverpool Docks, supra.* There are many such decisions. A strong case may be found in the Court of Queen's Bench, decided in 1840. It is *Mitchell* v. *Ede*, 11 Ad. & E. n. s. 888. A Jamaica planter, being the owner of sugars, and indebted to the defendant, residing in London, for more than their value, shipped them at Jamaica, on the 4th of April, on a ship belonging to the defendant which was in the habit of carrying supplies to Jamaica to the owner of the sugars, and others, and taking back consignments from him and others. On the same day he took a bill of lading by which the goods were stipulated to be delivered to the defendant at London, he paying freight. Two days afterwards (April 6) the shipper made an indorsement on the bill that the sugars were to be delivered to the defendant only on condition of his giving security for certain payments, but otherwise to the plaintiff's agent. He also drew drafts on the defendant. At the same time he indorsed the bill of lading, and delivered it to the plaintiff, to whom he was indebted. The bill was never in the defendant's hands. The sugars arrived in London; and the defendant paid the drafts drawn by the shipper, but did not comply with the conditions of the indorsement of April 6. On this state of facts, it was held by the court that the plaintiff was entitled to the sugars; that the shipper had not parted with the property by delivering it on board the defendant's ship, employed as it was, nor by accepting the bill of lading as drawn on the 4th of April; and that he was entitled to change the destination of the sugars till he had delivered them or the bill. In the case now in hand, there never was an instant, after the purchase of the wheat by McLaren & Co., when there was not an express reservation of the right to withhold the delivery from Smith & Co., and also an avowed purpose to withhold it until the drafts should be paid. Consent to consign the wheat to W. G. Fitch, cashier, care of Merchants' Bank, amounts, therefore, to no evidence of consent that it should pass into the control and ownership of the purchasers.

It has been argued on behalf of the plaintiffs in error that the correspondence between Smith & Co. and McLaren & Co. shows that the wheat was wanted by the former to supply their immediate need; and that, therefore, it was a legitimate inference that both parties to the correspondence intended an immediate delivery. If this were so, it was still in the power of the vendors to change the destination of the property until delivery was actually, or at least symbolically, made; and that the intention, if any ever existed, was never carried out, the bills of lading prove. It may be that Smith & Co. expected to secure early possession of the wheat by obtaining discounts from the Watertown bank, and then by taking up the drafts. If so, it would account for their request that the drafts and bills of lading might be sent through that bank; but that has no tendency to show an assent by either McLaren & Co. or the Milwaukee bank to an unconditional delivery of the property before payment of the drafts.

Nor does the fact that any engagement to hold themselves responsible for the safe keeping of the wheat for the plaintiff, and subject to its orders until the drafts drawn against it should be paid, was exacted from the Watertown bank, have any tendency to prove such an assent. This was an additional protection to the continued ownership of the plaintiff; and the words of the engagement plainly negative any consent to a divestiture of that ownership.

Without reference, therefore, to the testimony of McLaren, — which was, in substance, that, before the shipments, the agent of Smith & Co. was informed, that while the shipping firm would agree to send their time drafts through any bank he might designate, and consign the property to any responsible bank Smith & Co. might designate, they would adhere to their positive business rule in such cases, and on no account consent that any property so shipped should pass out of the control of the banks in whose care it had been placed until all drafts made against it had been paid, — without reference to this, we think it clear that the ownership of the wheat, for the conversion of which the defendants were sued, never vested in Smith & Co., never passed out of the plaintiff.

This is a conclusion necessarily drawn from the written and

uncontradicted evidence; and there is nothing in any evidence received, or offered by the defendants and overruled by the court, which has any tendency to resist the conclusion. It is unnecessary, therefore, to examine in detail the numerous assignments of error in the admission and rejection of evidence. None of the rulings have injured the defendants.

If, then, the Exchange Bank of Milwaukee was the owner of the wheat when Smith & Co. undertook to ship it to the defendants, and when the defendants received it and converted it to their use, the right of the bank to recover in this action is incontrovertible. Smith & Co. were incapable of divesting that ownership. The defendants could acquire no title, or even lien, from a tortious possessor. However innocent they may have been (and they were undoubtedly innocent of any attempt to do wrong), they could not obtain ownership of the wheat from any other than the owner. The owner of personal property cannot be divested of his ownership without his consent, except by process of law. It is not claimed, and it could not be, that the defendants were deceived or misled by any act of the plaintiff. They are the victims of a gross fraud perpetrated by Smith & Co.; and, however unfortunate their case may be, they cannot be relieved by casting the loss upon the plaintiff, who is at least equally innocent with themselves, and who has used the extremest precaution to protect its title.

It is sufficient to add, that, in our opinion, there is no just reason for complaint against the instruction given by the circuit judge to the jury, and his rulings upon the subject of damages and interest.   *Judgment affirmed.*

In the case of *Dows et al.* v. *Wisconsin Marine and Fire Insurance Company*, error to the Circuit Court of the United States for the Southern District of New York, MR. JUSTICE STRONG, in behalf of the court, remarked, " This case differs in no essential particulars from that of *Dows* v. *National Exchange Bank*, *supra*. It presents the same questions, and is controlled by the same rules of law. The judgment must, therefore, be affirmed."