By the Court.—Speir, J.
The verdict of the jury has established that the wheat came to the possession *525 of the defendants, and that there was a conversion. The inquiry now is, to whom did the wheat belong when it came into the hands of the defendants, and when they refused to surrender it, upon demand of the plaintiff ?
Sears & Daw, the shippers residing and doing business in Buffalo, received an order from the defendant, E. S. Brown, a commission merchant engaged in business in the city of New York, and dealer in grain, to buy wheat for him, and ship it and advance the purchase price themselves. The shippers, not being furnished with the funds for the purpose, borrowed the money of the plaintiff. It is not open to question that they, having purchased it at Buffalo, and paid for it. with their own money, became iis owners with full power and authority to dispose of it, as they saw fit, although the purchase was at the request of Brown, their correspondent, and on his ultimate account. Had they after the purchase sold the wheat to any one living in Buffalo, or any where else, other than Brown, the vendee would have had title as owner. They made this purchase as principal vendees without disclosing to their vendor for whom they were acting. It will not be contended that Brown, at whose request the wheat was bought, at this stage of the transaction could have interfered with the power of disposition ; and it is not pretended but that the shippers could have transferred their ownership to him in New York. They undoubtedly expected their correspondent Brown would become a purchaser from them, and it is to be presumed that they bought from their vendor with that reasonable expectation.
Before the purchase was made it appears that Sears and Daw called upon the plaintiff and stated to its cashier that they had the order to buy the two loads of wheat at the price named, and asked if the bank would discount drafts at twenty days, drawn by them *526 on the defendant, Brown, at New York, for an amount sufficient to pay for the grain, with the bill of lading, consigning it to the bank, as security. Upon obtaining the consent of the bank so to do, they made the purchase of a dealer in the city of Buffalo, of the two cargoes of grain in question, which was then in store in . an elevator in the City of Buffalo.
They then drew the drafts on their correspondent for the price, but they only agreed to deliver the wheat to the drawee upon the condition that the drafts should be accepted and paid. They shipped the wheat, but did not consign it to Brown, their correspondent, but consigned it to the cashier of the bank, and handed over to the bank the bills of lading as security for the drafts drawn against it. The bank discounted the drafts at the request of the drawers, and gave them a check for the proceeds, with which they paid for the grain so purchased. On the same day they caused the wheat to be laden on two canal boats, and the bills of lading made out and signed as to each boat, whereby the grain specified in each bill of lading was consigned to the plaintiff at the city of New York, to be delivered to the plaintiff, or its order, on payment of freight and charges, and ■ the correspondent Brown was directed to be notified by the carrier of its arrival. On the day of the date of the drafts the shippers advised Brown of the whole transaction, and sent him an account of the purchase. At the same time the cashier of the bank sent the drafts to the plaintiff’s correspondent in New York, the Bank of Commerce, with the bills of lading attached, and on them indorsed a letter addressed to Brown, stating in the most positive terms, that the bills of lading .with insurance on the same were pledged to the plaintiff, as security for the payment of the draft, and that the property was placed in his (Brown’s) custody in trust for that purpose, and that it was not to be diverted to any other use until *527 the draft was paid ; and that upon his accepting and paying the draft the claim of the bank would cease.
The drafts with the documents annexed were presented to Brown, and he thereupon accepted them, and detached and retained the bills of lading, and the certificates of insurance ailnexed. Brown made no objections to these instructions.
Shortly after the arrival at New York of the boats on which the wheat was shipped, Brown procured a sample of the wheat, and sold the wheat by such sample at the Produce Exchange. At this time the wheat was afloat on the boat and had not been delivered to any consignee.
The cargo, which came by the boat “Frank J. Dorr,” was thus sold to defendants Logan and Preston. After this sale Brown, by producing to the agent of the carrier the bill of lading for the cargo on the “Dorr” with the aforesaid indorsement thereon, caused "its delivery to the purchasers Logan and Preston.
The position taken on behalf of the defendants is that the wheat having been purchased at the request of Brown by Sears and Daw as his agents, in Buffalo, he was the general owner of the property from the time of their purchase ; that Sears and Daw had only a special title, as factors, for their advance of the purchase money; and that the bank by the transfer of the bill of lading to it acquired only such special title as pledgee, and upon its voluntary surrender to Brown he was vested with title as general owner, and discharged from any claim of the bank. In my opinion this position cannot be sustained, and has no foundadation in law or fact.
Before the wheat was purchased and after Brown’s requests to buy, he wrote to the shippers in substance asking them not to draw for any “margin” at sight, *528 but to advance the whole purchase price themselves, assigning as a reason that prior thereto they had purchased one or more cargoes oí grain on Brown’s order and had drawn on him at sight for part of the purchase price known as “margin” and a time draft for the balance, which they, S. & D., had procured to be discounted by the Bank of Commerce in Buffalo, with a bill of lading of the grain as collateral, and that the bank was refusing to deliver the bill of lading to Brown until the time draft was paid, and he, Brown, was trying to get possession of the bill of lading in that case, and suggesting to S. & D. to consign grain to his “ care ” instead of “ notifying me.”
Now, as it is clear that as to whether the property in the wheat passed to Brown, depends upon the answer which must be made to the question whether it was the intention of the shippers or the plaintiff, their successors in ownership, that it should pass before payment of the drafts, there can be no doubt what the answer must be. Up to the time Brown was informed of the purchase, and the whole transaction of the drawing of the drafts, and the bills of lading annexed, and' the presentation to him for acceptance, and the delivery of the bills, he had no relation whatever as owner of these cargoes of wheat. Whatever responsibility he assumed, arose only out of his act of acceptance as drawee of the drafts, and the voluntary assumption on his part to execute the trust. No intent to vest immediate ownership in the drawee of the drafts can be implied in the face of these express arrangements, and positive orders to the contrary. It was a clear case of bailment, utterly inconsistent with the idea of ownership in the bailee. “For the rule of law is general, that whatever a man’s real intention may be, if he manifests an intention to another party, so as to induce the other party to act upon it, he will be estopped from denying that the intention as manifested is his *529 real intention” (Benjamin on Sales, 306 [London Ed. 1868]; Freeman v. Cooke, 2 Excheq. 654). Moreover, these bills of lading upon their face are prima facie evidence of an intention to reserve to the shipper the jus disponendi and prevent the property from passing to the drawee of the draft (Jenkins v. Brown, 14 Q. B. 496; Dows v. National Exchange Bank, 91 U. S. 618; Turner v. Trustees of Liverpool Docks, 6 Excheq. 543). An early case is reported in 3 Camp. 92, Barrow v. Coles, which bears great resemblance to the case before us. It was trover for one hundred bags of coffee. N. and F. at Demarara, drew a bill of exchange upon one Yoss in London, payable to their own order, and indorsed it to the plaintiff, at the same time annexing to it a bill of lading of the coffees in question, with an indorsement upon it making them deliverable to Yoss if he should pay the draft, if not, to the holder of the said draft. The bill of exchange and the bill of lading being sent to Yoss he accepted the former and detached the latter from it. He then indorsed the bill of lading for a valuable consideration to the defendant, but he did not-pay the bill of exchange. Lord Ellen-borough held that the special indorsement on the, bill of lading ought to have made the defendants inquire whether the condition on which the coffees were deliverable to Yoss had been fulfilled, and that after the dishonor of the bill of exchange the property in the coffees vested in the plaintiff.
There was abundant evidence in this case apprising the defendants of their duty to inquire for Brown’s authority and power to give title to the wheat. Their broker knew that it was “Milwaukee No. 2,” that it was then afloat on a canal boat, and had not then been delivered to any consignee (Dows v. Perrin, 15 N. Y. 325 ; Bank of Toledo v. Shaw, 61 Id. 283).
The plaintiff then being the owner of the wheat when Sears and Daw undertook to ship it to the de *530 fendant Brown, and when he received it, and converted it to his own use by a sale to the co-defendants, the right of the plaintiff to recover cannot be controverted. Brown could not divest it of the ownership. He held the wheat in trust for an express purpose, and the other defendants had, from, all the circumstances of the case, abundant notice to put them upon inquiry.
It is not disputed that where there are circumstances in effect pointing, in different directions, some indicating an intent to pass the ownership at once, notwithstanding the bill of lading, it becomes a question for the jury whether the property has passed. In this case I cannot find any facts disclosed to rebut the intent to retain ownership on the part of the bank. The bills of lading with their indorsements, and the written instructions, to hold the whéat till payment of the drafts, are not even subject to any interpretation or construction other than they bear on their face. There was no evidence received or offered tending to show any other intent. The circumstances relied upon by the defendants as tending to show that the property of the wheat vested in Brown, are not entitled to- the significance attributed to them.
The defendants very properly were not allowed to prove or avail themselves of any alleged usage or custom of business among grain dealers in New York, or in the Produce Exchange, which would aid them to make title to the wheat. The evidence would be immaterial and incompetent, because such usage or custom could not be invoked either to change the established rules of law, or to change or modify the express terms of a contract. Here there was an express contract between the parties, which was neither ambiguous nor uncertain, and such evidence could not be resorted to. In our opinion there is no good ground for complaint against the rulings of the learned judge on the *531 trial, and the exceptions must be overruled. The judgment must be affirmed with costs.
Sedgwick, J., concurred.