No. 22,403.

A. S. Bennett, doing business as The Bennett Commission Company, *Appellant*, v. J. M. Dickinson, as Receiver of The Chicago, Rock Island & Pacific Railway Company, and The Union Pacific Railroad Company, *Appellees*.

SYLLABUS BY THE COURT.

1. Bill of Lading—*With "Shipper's Order" and "Notify Purchaser" Clauses—Draft Attached—Title Does Not Pass Until Draft is Paid.* The term "shipper's order" as used in bills of lading is well understood, and means that the title remains in the shipper until he orders the delivery of the goods. Under a shipment of a car of corn consigned by the seller to himself, "notify the purchaser," the bill of lading having attached thereto a customer's draft drawn by the seller on the purchaser and sent to a bank for collection, the title does not pass to the purchaser until the draft is paid and the bill of lading surrendered, in the absence of evidence to overcome the presumption that this was the intention.

2. Same. It is a common practice, where a bill of lading provides for delivery to the consignor's order and has gone forward attached to a draft on the purchaser or other person by whom payment is to be made, to give directions that such person be notified on the arrival of the goods in order that he may pay the draft and procure the goods. The very presence of the word "notify" in such a case shows that the person named is not intended as the consignee, but is simply to be advised on the arrival of the goods. The fact that a bill of lading is made out to the consignor's order, to which is attached a draft drawn upon the person to be notified, makes this still plainer.

3. Same. Plaintiff, who was in business at Topeka, contracted to purchase a carload of corn from a shipper at Clayton, Kan., "basis track Clayton buyer's routing." In the letter of confirmation the shipper was directed to bill the car of corn "to us at Shady Bend, Kansas, via Colby and draw on us in the usual manner with papers attached." The shipper followed the instructions, and procured a "shipper's order notify" bill of lading, to which he attached a customer's draft drawn on the purchaser, which was sent through the banks for collection. The corn was damaged in transit. The draft was paid on the day the car reached its destination. *Held*, that the title not having passed to the purchaser until the draft was paid, he cannot maintain an action to recover damages to the corn occurring in transit.

4. Same—*Consignor Reserved Title in Himself.* Evidence examined, and *held* insufficient to overcome the presumption that the consignor intended to reserve title in himself and, therefore, there was nothing to submit to a jury.

Bennett v. Railway Co.

Appeal from Shawnee district court, division No. 1; ROBERT D. GARVER, judge. Opinion filed January 10, 1920. Affirmed.

*Eugene S. Quinton,* of Topeka, for the appellant.

*Luther Burns,* and *John E. DuMars,* both of Topeka, for the appellees.

The opinion of the court was delivered by

PORTER, J.: A. S. Bennett, under the name of the Bennett Commission Company, was engaged in buying and shipping grain at Topeka. J. E. Rule was in the same business at Clayton, in Norton county. Bennett contracted to purchase from Rule a carload of corn to be delivered at Shady Bend via Colby. While in transit over the Chicago, Rock Island & Pacific Railway the corn was damaged, and Bennett sued the receiver of the railway company to recover the damages. The jury returned a verdict in favor of the plaintiff and made a number of special findings. One of the findings is, that there was no contract, agreement or communication between plaintiff and Rule in regard to the purchase of the corn other than the several letters and telegrams which were offered in evidence. The defendant thereupon moved for judgment in its favor on the special findings, notwithstading the general verdict. The court sustained the motion, and the plaintiff appeals.

The sole controversy in the case is whether the title to the corn had passed to Bennett at the time the damage to the corn was sustained. The contract consisted of a proposal of Rule to Bennett in a letter in which he said the corn "ought to bring me 68½ here. Will offer you a car at that if you want it and will advise promptly." The next day Bennett wired an acceptance of the offer, followed by a letter of confirmation, which read:

"This confirms our purchase from you to-day, of one car of 3 mx corn at 68½ cents, basis track Clayton buyer's routing, subject to Kansas inspection, certified weights, to be shipped from Clayton within ten days via R. I. Railway. Bill it to us at see letter."

Two days later, Bennett wrote:

"Please bill the car of corn last bought from you, to notify us at Shady Bend, Kansas, via Colby and draw on us in the usual manner with papers attached."

By letter dated May 3, Rule advised Bennett of the shipment, and said:

"Have shipped to you on contract 1 car at 68½ here, the following:" (stating the number and initial of the car and grade, weight and price with a memorandum that a draft for $1,015.39 had been drawn).

The bill of lading which accompanied the shipment contained what is known as a "shipper's order" clause, and the recital that J. E. Rule was the shipper; that the car was consigned to his order, "destination Shady Bend (Topeka). . . . Notify Bennett Com. Co. at Topeka." It also contained a statement that "the surrender of the original bill of lading properly indorsed shall be required before the delivery of the property." Rule indorsed the bill of lading in blank and attached thereto a draft upon the Bennett Commission Company for $1,015.39, the price of the corn. On May 7 the draft reached the bank at Topeka and was paid by Bennett. On the same day the corn arrived at Shady Bend. The trial court held that the correspondence and the whole transaction showed that no title to the corn passed to Bennett until he paid the draft, and that the loss and injury having been sustained prior to the time the draft was paid, Bennett could not maintain the action.

The meaning of a bill of lading containing what is known as a "shipper's order" clause, or as it is sometimes termed, an "order notify" clause, is well established. The authorities universally hold that where the goods are consigned by the shipper to himself with a draft and bill of lading, which are forwarded to a bank with instructions to deliver the bill of lading only on payment of the draft, the title does not pass until the draft is paid. In 10 C. J. 259, it is said:

"The term 'shipper's order' as used in the bill of lading is well understood and means that the title remains in the shipper until he orders a delivery of the goods, and that the carrier must not deliver except on production of the bill of lading properly indorsed by the shipper. And, where the bill of lading provides for delivery to the shipper's order or to his assigns, it is liable for the value of the property to the person entitled to receive the goods if it delivers the goods to the consignee or anyone else without the bill of lading properly indorsed. Especially are the foregoing rules applicable where the 'shipper's order' bill of lading has attached to it a draft on the buyer, or where the bill of lading ex-.

pressly provides that the goods shall not be delivered without its surrender properly indorsed. . . .

"Where a bill of lading or a shipping receipt contains a clause providing that a third person shall be notified of the arrival of the goods, or where it contains this clause and an additional clause reciting that the goods are shipped to the consignor's order, the carrier is not authorized to treat the person to be notified as a consignee, and if it delivers the goods to him without production and surrender of the receipt or the bill of lading, it will be liable to the true owner of the goods for any loss resulting from such delivery. Delivery of the goods under these circumstances without surrender of the receipt or the bill of lading constitutes a conversion. A direction of this character in a shipping receipt or a bill of lading raises no presumtion that the person to be notified is the consignee, but on the contrary indicates that the carrier is not entitled to deliver the goods except on production of the bill of lading." (p. 259.)

In 4 Elliott on Railroads, 2d ed., section 1427, it is said:

"The use of the term 'notify' shows that the party to be notified was not intended as the consignee, but was simply to be advised on the arrival of the goods. The fact that a bill of lading is made out to the consignor's order makes this still plainer. Indeed, it has been held that such a contract is so plain and unambiguous that a custom in a certain city to deliver property under similar bills of lading to the person to be notified cannot be shown."

Rule, who made the shipment and received the bill of lading, was both consignor and consignee of the shipment. His indorsement of the bill of lading in blank was evidently for the purpose of facilitating the collection of the draft through the banks, and retaining absolute control until title to the corn would finally pass to Bennett when the bill of lading was taken up. When the carrier issued the bill of lading, the title to the corn was in Rule, and it remained there until the draft was paid.

In 1 Mechem on Sales, section 774, it is said:

"Where the seller takes a bill of lading which expressly stipulates that the goods are to be delivered, at the point of destination, to himself or agent, or to his order or assigns, there is the clearest possible evidence upon the face of the transaction that, notwithstanding such an appropriation of the goods as might have been sufficient to transfer the title to the buyer, the seller has determined to prevent this result by keeping the goods within his own control. This evidence, however, is not absolutely conclusive, though, as stated by the supreme court of the United States, 'it is held to be almost conclusive.' "

The case to which Mr. Meehem refers is *Dows et al. v. National Exchange Bank*, 91 U. S. 618, where the court said:

Bennett v. Railway Co.

"These bills of lading, unexplained, are almost conclusive proof of an intention to reserve to the shipper the *jus disponendi*, and prevent the property in the wheat from passing to the drawees of the drafts." (p. 631.)

The plaintiff quotes from 1 Benjamin on Sales, section 568, as follows:

"Fourthly. The *prima facie* conclusion that the vendor reserves the *jus disponendi*, when the bill of lading is to his order, may be rebutted by proof that in so doing he acted as agent for the vendee, and did not intend to retain control of the property; and it is for the jury to determine, as a question of fact, what the real intention was."

Some reliance seems to be placed upon the fact that at the time the corn was shipped Rule sent the invoice to Bennett, but the invoice was no evidence of an intention to pass the title. In *Dows et al. v. National Exchange Bank,* supra, in a case where the rights of a bank were involved, and invoices had been sent to the buyer, the court said:

"Accordingly, they drew drafts for the price; but they never agreed to deliver the wheat to the drawees, unless upon the condition that the drafts should be accepted and paid. They shipped it; but they did not consign it to Smith & Co. and they sent to that firm no bills of lading; on the contrary, they consigned the wheat to the cashier of the Milwaukee Bank, and handed over to that bank the bills of lading as a security for the drafts drawn against it—drafts which the bank purchased. It is true, they sent invoices. That, however, is of no significance by itself. The position taken on behalf of the defendants, that the transmission of the invoices passed the property in the wheat without the acceptance and payment of the drafts drawn against it, is utterly untenable. An invoice is not a bill of sale, nor is it evidence of a sale. It is a mere detailed statement of the nature, quantity and cost or price of the things invoiced, and it is as appropriate to a bailment as it is to a sale." (p. 630.)

Now what are the circumstances upon which plaintiff must rely to overcome the "almost conclusive" presumption that the title was intended to be retained by Rule until the draft was paid? It is said in the brief:

"There can be no doubt upon this proposition that Mr. Rule is offering to the Bennett Commission Company, at Clayton, Kansas, . . . where he lives, has his elevator and from which point the letter is addressed, . . . a car of corn at 68½ cents."

It is insisted that this offer was accepted by the telegram and the confirmation from Bennett. The confirmation stated "68½ cents basis track Clayton buyer's routing."

We think the trial court was right in holding that the expression "basis track Clayton" had nothing whatever to do with the delivery or with the passing of title from the seller to the buyer. The words "68½ here," "68½ cents basis track Clayton," are equivalent to a statement that Rule was to load the corn in a car at Clayton, and that the buyer was to pay the freight to whatever point he might direct shipment.

One of plaintiff's main contentions is that the correspondence constituting the contract discloses clearly that Rule was acting solely as the agent of Bennett. We assume this means from the time Bennett accepted Rule's offer. It is insisted that in the letters of confirmation Bennett directed Rule what to do, which was to "bill the car of corn last bought from you, to notify us at Shady Bend, Kansas, via Colby and draw on us in the usual manner with papers attached"; that Rule did exactly as the plaintiff told him; delivered the corn to Bennett or to the Bennett Commission Company on the tracks of the railway at Clayton, received a bill of lading for the same to "order of J. E. Rule, . . . notify Bennett Com. Co.," etc., and immediately sent Bennett advice of what he had done. When Rule offered to take a fixed price for the corn at Clayton, he knew that upon acceptance of the offer Bennett had the right to direct and would inform him of the destination to which the corn was to be shipped; and there is nothing in the correspondence to suggest that either party intended to depart from the usual and ordinary method employed in thousands of similar transactions occurring in the business world every day.

We are unable, as was the trial court, to find anything in these circumstances to indicate an intention different from the ordinary transaction where goods are consigned by the shipper to himself and a draft and bill of lading are forwarded to a bank with instructions to deliver the bill only on payment of the draft. In the memorandum opinion the court said:

"Rule's intention is plainly evidenced by his actions. He consigned the car to himself under circumstances which made it impossible for Bennett to get the car until he paid the draft. Rule not only did this, but he did it at Bennett's request, and Bennett's testimony is to the effect that it was always his intention that the transaction should be carried out just as it was carried out, and that this was his intention when he mailed the confirmation containing the words 'basis track Clayton.' . . . In no view of the case am I able to find any evidence even tend-

ing to establish any intention of the parties to pass title to this car on delivery to the carrier at Clayton, and as the court construes the contract it had no such effect."

Instead of the facts and circumstances upon which plaintiff relies overcoming the presumption that title was not intended to pass until the draft was paid, they show that there was nothing in the whole transaction to take it out of the ordinary case of a "shipper's order" bill of lading. The construction of the written contract between the parties was solely for the court, and there was nothing in the case to submit to a jury. In *Dows et al. v. National Exchange Bank,* supra, the wheat, at the request or direction of the buyer, was consigned to the cashier of a bank. There was an express direction to hold the wheat until the payment of the drafts, and to deliver only on payment. The manner in which the draft in the case at bar was drawn and handled showed the same intention. In the opinion in the case just cited, the court, after stating that "where there is anything to rebut the effect of the bill . . . it becomes a question for the jury, whether the property has passed," used the following language, which seems quite appropriate to the case at bar:

"But in this case there are no circumstances to rebut the intent to retain ownership exhibited in the bills of lading, and confirmed throughout by the indorsements on the bills, and by the written instructions to hold the wheat until payment of the drafts. Nothing in the evidence received or offered tended to show any other intent. Hence, there was no necessity of submitting to the jury the question, whether there was a change of ownership. That would have been an invitation to find a fact of which there was no evidence. The circumstances as relied upon by the plaintiffs in error, as tending to showing that the property vested in A. F. Smith & Co., cannot have the significance attributed to them."

The judgment is affirmed.