# CHARLESTON.

### NEILL & ELLINGHAM *v.* ROGERS BROS. PRODUCE CO. (FIRST NAT. BANK OF SANTA BARBARA, *Intervener*).

Submitted June 7, 1895—Decided Nov. 13, 1895.

1.   BILL OF LADING—DRAFT—GOODS IN TRANSIT.
     A party discounting a draft, and receiving therewith, deliverable to his order, a bill of lading of the goods against which the draft was drawn, acquires a special property in them, and has a complete right to hold them as security for the acceptance and payment of the draft.

2. BILL OF LADING—GOODS IN TRANSIT.

In the hands of the holder of a bill of lading it is evidence of ownership, special or general, of the property mentioned in it, and of the right to receive the property at the place of delivery.

3. BILL OF LADING—PROPERTY IN PLEDGE.

The delivery of a bill of lading for a valuable consideration, whether this arises at the time or res's upon a previously existing debt, confers the right to the property without taking actual possession of it, or doing any further act to perfect the title.

4. BILL OF LADING—TITLE OF PLEDGEE—SECURITY FOR ADVANCES.

A bill of lading confers upon the person in whose favor it is issued or to whom it is transferred the title to the goods; and this although the transaction is not intended to give the permanent ownership, but to furnish security for advances of money or discount of commercial paper upon the faith of it.

5. BILL OF LADING—CONSIGNEE—ATTACHMENT - CARRIER.

It is no defence to the claim of the consignee that the goods have been attached or seized by virtue of any judicial process. The contract of the carrier is that he will deliver the goods in good order and condition to the shipper or to his assigns. He thus guarantees to protect the possession of the shipper and his assigns.

6. ATTACHMENT—CREDITOR—DEBTOR.

An attaching creditor can acquire no greater right in attached property than the defendant had at the time of the attachment. If the property be in such a situation that the defendant has lost his power over it, or has not yet acquired such interest in or power over it as to permit him to dispose of it adversely to others, it can not be attached for his debt.

7. ATTACHMENT—MORTGAGED CHATTEL—PAWNED CHATTEL.

A chattel pawned or mortgaged is not attachable in an action against a pawner or mortgagor.

WHITE & ALLEN for plaintiff in error, cited Code, c. 106, s, 23; Schoul. Bail. & Car. §§ 167, 173, 189, 190, 221, 246. 261 ; Jones, Chat. Mort. § 4; Drake Attach. § 245 ; Morse, Banks & Bank. § 726 ; 2 Hen. & Munf. 308 ; 96 U. S. 477 ; 30 Kan. 386 ; 17 Pick. 85 ; 95 Pa. St. 432 ; 10 Me. 27; 12 Me. 396 ; 54 Tex. 593 ; 4 W. Va. 130 ; 7 W. Va. 688 ; 9 Wheat. 581; 11 Wheat. 431 ; 5 Wall. 663; 138 Mass. 398, 408-11; 33 W. Va. 418; 91 U. S. 618; 71 N. Y. 353 ; 76 Ind. 223 ; 9 W.Va. 373-4, 382-3, 385-7, Syl, 12 pt.; 3 Leigh, 695, 699 ; 87 Pa. St. 525; 92 Pa. St. 57; 87 Ill. 296; 124 Mass. 311; 57 N. Y. 34; 37 W. Va. 847; 38 W. Va. 84; Rand. Com. Paper, § 1393.

HENRY M. RUSSELL for defendants in error, cited 19 Grat. 383; 24 W. Va. 752; 28 W. Va. 349; 87 Cal. 569; 38 Kan. 533; 71 Iowa, 425; 85 Geo. 626; 51 Cal. 64; 32 N. J. Eq. 467; 111 U. S. 125; 30 Kan. 412; 93 U. S. 92; 105 Pa. St. 496; 83 N. Y. 287; 132 Mass. 103; 2 Leigh, 493; 5 Wal. 663; 3 How. 515; 9 Wheat. 581; 11 Wheat. 431; Nemark on Bank Deposits, § 117; Jones Chattel Mortgages, § 5; 9 W. Va. 373; 66 N. Y. 271; 3 Leigh, 695; 1 Dan'l Neg. Insts. 657; 30 W. Va. 204; 33 W. Va. 444; 14 Am. & Eng. Enc. Law, 686, 698; 8 Grat. 496; 83 N. Y. 287; 1 Greenl. Ev § 348; 155 Pa. St. 187; 36 W. Va. 32; 35 W. Va. 666; Code, c. 106, s. 23.

ENGLISH, JUDGE:

Rogers Bros. Produce Company, a corporation of the city of Santa Barbara, Cal., consigned to the firm of Neill & Ellingham, of the city of Wheeling, W. Va., two hundred and six bags of prunes, and drew a sight draft on said Neill & Ellingham, payable to the First National Bank of Santa Barbara, for one thousand, seven hundred and seventy six dollars and twenty two cents, dated September 15, 1890, and delivered said draft, together with the bill of lading received by them from the Atlantic & Pacific Railroad Company, properly indorsed by them, to said bank. Said draft was indorsed to the Chemical National Bank, of New York by the cashier of the First National Bank of Santa Barbara, and from said Chemical National Bank, with said bill of lading, was sent to the National Bank of West Virginia, at Wheeling, for collection, and, when presented, payment of the same was refused.

On the 3d day of October, 1890, the said firm of Neill & Ellingham caused an attachment for the sum of three thousand, five hundred and thirty four dollars and forty four cents to be levied upon said prunes, which at the time of said levy were in the possession of the Baltimore & Ohio Railroad Company.

On the 20th day of November, 1890, the First National Bank of Santa Barbara filed its petition, alleging that under said attachment two hundred and six bags of prunes had been levied on and taken from the possession of the

Baltimore & Ohio Railroad Company, and were then held by the sheriff of said county of Ohio, and that petitioner had such a claim to and interest in said property as entitled it to have the same released from such levy; that on the 15th day of September, 1890, in consideration of the sum of one thousand, seven hundred and seventy six dollars and twenty two cents then paid by petitioner to the above named Rogers Bros. Produce Company, said produce company made and delivered to petitioner its bill of exchange or draft for said sum, drawn upon said Neill & Ellingham, payable at sight to the order of petitioner, and at the same time indorsed and delivered to petitioner a bill of lading for said property, issued by the Atlantic & Pacific Railroad Company in favor of the order of said Rogers Bros. Produce Company; that petitioner became, on said 15th day of September, 1890, and before the levying of said attachment, and ever since said date has been, and then was, the owner in good faith and for a valuable consideration of said property and of said bill of exchange and bill of lading, and was entitled to the possession of said property; and petitioner prayed that such orders might be made as might be necessary to protect its rights.

The questions raised by this petition were, on the 1st day of May, 1891, submitted to a jury, and resulted in a verdict for Neill & Ellingham, and that the property in controversy was not, at the time of the attachment, the property of the National Bank of Santa Barbara. A motion was made by the petitioner to set aside the verdict, and grant it a new trial, which motion was overruled. The said bank excepted. A writ of error was obtained to this Court, which was heard and considered, resulting in reversing and remanding the case.

On the 26th day of April, 1894, the questions raised by said petition were again submitted to a jury, and again resulted in finding for said Neill & Ellingham. A motion was made by said petitioner to set aside the verdict, and award it a new trial, which motion was overruled, and the said bank excepted, and during the trial took several bills of exception to various rulings of the court, and applied for and obtained this writ of error.

It is claimed in the assignment of error that the court erred in refusing the instructions to the jury offered by the petitioner, and in granting the instructions given for the plaintiffs. The first instruction asked for by the petitioner and refused by the court reads as follows: "The court instructs the jury that the issue for them to decide is simply whether, at the time of the levy of the plaintiffs' attachment, the First National Bank of Santa Barbara had title to or lien on or any interest in the property mentioned in the bill of lading, marked 'Exhibit B' or its proceeds." Now, in order to pass upon the correctness of this instruction, our attention is first directed to the statute under which said petition was filed, and we find that section 23 of chapter 106 of the Code provides that "such petition shall state a claim to, or an interest in or lien on the property attached under any other attachment or otherwise and its nature, and upon giving security for the costs the court without any other pleading shall impanel a jury to inquire into such claim." And when we turn to the petition filed by said bank, its concluding clause reads as follows: "Your petitioner became, on the 15th day of September, 1890, and before the levying of said attachment, and ever since said date has been, and now is, the owner in good faith and for a valuable consideration of said property and of said bill of exchange and bill of lading, and is entitled to the possession of said property." And the orders entered on the 1st day of May, 1891, as well as on the 26th day of April, 1894, show that the jury were sworn to inquire into the claim of said bank. What claim? Surely the claim asserted in the petition. What possible objection could there be to the instruction asked for by petitioner that "the issue for the jury to decide was simply whether, at the time of the levy of the plaintiffs' attachment, said bank had title to or lien on or any interest in the property mentioned in the bill of lading, marked 'Exhibit B,' or its proceeds." The statute required that they should inquire into such claim, and the petitioner had a right to call the attention of the jury by an instruction to the true inquiry or question before them, and the refusal of the instruction had a direct tendency to prejudice his case.

The petitioner also asked the Court to instruct the jury that : "Before the plaintiffs, Neill & Ellingham, could be entitled to have the transfer of the two hundred and six bags of prunes by the Rogers Bros. Produce Company to the First National Bank of Santa Barbara treated as void because of fraud, they must satisfy the jury, by the evidence in the case, that the produce company was actuated by a fraudulent purpose in making the transfer, and that the bank participated in this fraudulent purpose, or had knowledge of it at the time when the transfer was made"—which instruction the court refused to give in the form in which it was asked, but which the court gave with the following addenda : "Or that, after the bank knew of the plaintiffs' attachment, it combined with the Rogers Bros. Produce Company fraudulently to defeat the plaintiffs' claim." Now, so far as the pleadings go, there is no allegation of fraud by the plaintiffs, either in their affidavit for attachment or otherwise.   The order of attachment bears date on the 3d day of October, 1890, and was levied on the same day, while it appears in the answer of said bank to the interrogatories filed that the Rogers Bros. Produce Company delivered said draft and bill of lading to said bank on the 15th day of September, 1890, and the same thing is shown by the deposition of the cashier of said bank ; so that, the draft and bill of lading having been assigned to the bank eighteen days before the attachment issued, said bank could not have had notice of the levy of the attachment at the time said draft and bill of lading were assigned to it, and under this state of facts the court was not warranted in adding what it did to said instruction No. 2.

Said bank, by its counsel, also asked the court to give the following instruction marked "No. 3 :" "The pledge of an indorsed bill of lading of goods in transit by land or water transfers the special property in the goods against third persons as well as against the pledgor himself"—which instruction the court refused to give as asked, but gave in lieu thereof the following : "The pledge of an indorsed bill of lading of goods in transit by land or water confers a lien upon the property as against third parties as well as

against the pledgor himself." This presents a purely legal question, and we find in the case of *Bank* v. *Wright*, 48 N. Y. 1, it appeared that V., at Chicago, transferred to the Marine Bank a bill of lading for corn shipped to Wright, in New York, the bank discounting a draft at sight, drawn on the faith and credit of the bill of lading. Hunt, C., giving the opinion of the court, said: "The transfer of the bill of lading to the plaintiff (the bank) under the circumstances stated transferred also the title to the corn described in it. The transfer was conditional and limited, to wit, to provide for and until the acceptance of the draft. The title would then pass to the acceptors as their security, and the plaintiff's security would be transferred to the personal liability of the defendants as acceptors. The defendants having refused to accept the draft, the title of the plaintiff to the corn remained unimpaired." So in 2 Am. & Eng. Enc. Law, p. 243, the law is stated thus: "Where a bill is transferred or delivered as collateral security, the rights of the pledgee thereunder are the same as those of an actual purchaser of the goods for value, so far as the exercise of those rights is necessary for the holders' protection;" citing *Dows* v. *Bank*, 91 U. S. 618, in which case it was held that a party discounting a draft, and receiving therewith, deliverable to his order, a bill of lading of the goods against which the draft was drawn, acquires a special property in them, and has a complete right to hold them as security for the acceptance and payment of the draft. Regarding this as a correct statement of the law, we think the court was not warranted in refusing to give said instruction No. 3 as asked for by petitioner, or in giving the instruction which was given by the court in lieu thereof.

Petitioner also asked the court to give to the jury instruction No. 4, in the following words: "A draft drawn by a seller against a buyer in favor of a national bank, by which it is discounted or purchased, with the bill of lading attached, passes title to the goods and draft to the bank,"— which instruction the court refused to give to the jury, but gave in lieu thereof the following: "A draft drawn by a seller against a buyer in favor of a national bank, by which it is discounted or purchased, with a bill of lading attached,

passes to the bank title to the draft, and gives the bank a lien on the goods." Under the decisions above quoted, the petitioner was entitled to the instruction in the form it was asked.

The petitioner also asked the court to give to the jury the following instructions: "(6) The court instructs the jury that if they believe from the evidence that, before the attachment of the plaintiffs was levied on the two hundred and six bags of prunes, the bill of lading for the prunes had been pledged to the First National Bank of Santa Barbara, and that the sum for which the pledge was given has not been paid to the bank, or the pledge released by it, their verdict must be for the petitioner, the First National Bank of Santa Barbara. (7) The court instructs the jury that the First National Bank of Santa Barbara was not, either when it received notice that the draft for one thousand, seven hundred and seventy six dollars and twenty two cents was not paid or when it received information that the prunes had been attached by the plaintiffs, obliged to charge the amount of said draft against the deposit account of the Rogers Bros. Produce Co., or to apply the funds of the produce company on deposit with the bank at the time of such notice or information to the payment of said draft ; and the failure to make such charge or application is no defence to the claim of the bank in this case. (8) The court instructs the jury that the issue in this case is simply one to determine the right of property to the prunes, and not in any way to determine the indebtedness of the Rogers Bros. Produce Company to Neill & Ellingham. (9) The jury is not justified in presuming fraud from mere suspicions which may be suggested to their minds by counsel, and can not be justified in holding that the bank was guilty of fraud, unless such fraud is clearly shown to the minds of the jury by the testimony. (10) The court instructs the jury that if they believe from the evidence that the First National Bank of Santa Barbara purchased the draft drawn by Rogers Bros. Produce Company on Neill & Ellingham, and dated September 15, 1890, their verdict must be for the bank." All of which instructions were refused by the court, and in lieu of said instructions Nos. 8 and 9 the following were

given : "(8) The court instructs the jury that the issue is not in any way to determine the indebtedness of the Rogers Bros. Produce Company to Neill & Ellingham. (9) The jury is not justified in presuming fraud from mere suspicions which may be suggested to their minds, and can not be justified in holding that the bank was guilty of fraud, unless such fraud is shown from the evidence in the case, or from such facts and circumstances in evidence as will enable them to fairly deduce fraud." Said instructions Nos. 6, 7, 8, 9, and 10 appear to propound correctly the law of the case, and should not have been refused.   As to instruction No. 10, another element might have been added with propriety, to wit, the assignment and delivery of the bill of lading ; but, in the absence of that feature, which gave strength to the claim of the petitioner, Daniels on Negotiable Instruments, under the heading of "Bills Drawn on Shipments" (volume 2, p. 769) states the law thus: "If the consignor draw a draft and procure an advance upon the faith of the shipment without indorsing or delivering the bill of lading to the lender, the latter will be entitled to a lien upon the proceeds of the cargo as against other creditors of the consignor, upon the principle that a bill of exchange drawn upon a particular fund operates as an assignment thereof," citing *Bank* v. *Garfield*, 30 Hun. 580, and *Morse* v. *Railroad Co.*, 73 Iowa, 233 (34 N. W. 825). As to the propriety of said instruction No. 7 which was asked for by petitioner and refused by the court, that the petitioner was not obliged to charge the amount of said bill of exchange against the deposit account of Rogers Bros. Produce Company with it as soon as it received notice that said draft had not been paid, and that the prunes had been attached, and that the failure to make such charge was no defence to the claim of the bank in this case, the petitioner was clearly entitled to it ; for, if the draft was merely received by petitioner for collection, as is contended by the defendants in error, it would surely be queer conduct on the part of a collecting agent, who had no other authority than that of collecting the money and accounting for the same, less its commissions, as soon as the party on whom the draft was drawn refused to pay it, and attached the

property against which it was drawn, to charge the deposit account of the owner of the draft with the amount of the same, or, in other words, make the drawer pay the draft out of his own pocket, without making any effort to collect the amount from the payee. But if, on the other hand, petitioner was not a mere collecting agent, as it contends, but was a *bona fide* holder of said draft for value, with the bill of lading assigned to it as a collateral, does that alter the case, and would the petitioner thus situated have to charge the amount of said draft to the deposit account of the drawer as soon as the drawee failed to accept and refused to pay the draft? Surely not; and, if it did, in the circumstances developed in this case, the right of recourse against the drawer would be extremely doubtful. Being the owner of the draft, and by the assignment of the bill of lading the owner of the prunes until they were paid for, it was the duty of petitioner to prosecute the claim, and, if the property was attached as the property of the drawer, to interplead, as it did in this case, and resist the claim under the attachment; otherwise petitioner could return with poor grace to the drawer, and demand a return of its money, when the entire cargo had been assigned to it for the protection of the draft, and had been surrendered without an effort.

The court gave, at the instance of the plaintiff, six instructions to the jury, which were excepted to by petitioner, and read as follows: "(1) If the jury believe from the evidence that the draft in controversy in this case was received by the First National Bank of Santa Barbara from Rogers Bros. Produce Company for collection only, the said bank can not recover in this action, and the jury should find for Neill & Ellingham" "(3) If the jury believe from the evidence that the First National Bank of Santa Barbara purchased from Rogers Bros. Produce Co. the draft here in controversy, taking the bill of lading as collateral, yet, if they further believe that at the time when the said bank received notice of the dishonor of the draft and of the attachment of Neill & Ellingham the Rogers Brothers Produce Company had on the books of the said bank an amount of credit, over and above all indebtedness of said company to said bank then due, sufficient to cover the said

draft, then it was the duty of the said bank to apply such credit; or so much thereof as was necessary, to the payment of the said draft; and if the bank failed to do so it lost, as against attaching creditors of said company, its lien upon the prunes covered by the said bill of lading, and can not recover in this action, but the jury must find for Neill & Ellingham. (4) Whether the First National Bank of Santa Barbara purchased the draft in controversy or took it for collection merely, yet, if the jury believe from the evidence that the words 'No protest' were upon the draft when it was delivered to the said bank, or were afterwards placed upon the draft with the assent of the Rogers Brothers Produce Company, then the said bank, if defeated in this action, is entitled to recover the amount of the said draft from the Rogers Brothers Produce Company. (5) The jury are instructed that the pledge of personal property, as by the transfer of a bill of lading as collateral security, does not pass to the pledgee the title to the said personal property, but merely creates a lien, the property remaining the property of the pledgor, subject to such lien; and that another creditor of the pledgor may attach such property as the property of the pledgor, subject to any valid rights acquired by the pledgee by reason of such pledge or transfer. (6) If the jury believe from the evidence that the draft in controversy was purchased by the First National Bank of Santa Barbara from Rogers Brothers Produce Company; and if they further believe from the evidence that at the time when the said bank received notice of the dishonor of the draft and of the attachment of Neill & Ellingham the said Rogers Brothers Produce Company had to its credit on the books of the bank an amount sufficient, or more than sufficient, to satisfy the said draft; and if they further believe from the evidence that at the same time the said Rogers Brothers Produce Company was indebted to the said bank to an amount equal to or larger than the amount of the said credit—it is then for the jury to determine from the evidence whether the said indebtedness of the said Rogers Brothers Produce Company to it was of such a character as that the said bank was entitled to retain as an offset against such indebted-

ness the amount of such credit.  If, therefore, the jury believes from the evidence that such indebtedness was not yet due, or that for any other reason the said bank was not at that time entitled to retain the said credit, and apply it to the payment of such indebtedness; and if they further believe that, apart from such or so much of the said indebtedness as was not yet due, or was otherwise of such a character as that the said bank was not entitled to hold such credit against it, there was upon the books of the said bank to the credit of the said Rogers Bros. Produce Company an amount sufficient to cover the said draft— then the said bank can not recover in this action, and the jury should find for Neill & Ellingham."

As to said first instruction given at the instance of the defendant in error, Daniels on Negotiable Instruments (volume 1, § 340) under the heading "Controversies as to the Ownership of Paper Placed in Bank to be Collected," says: "A variety of circumstances give rise to controversies as to the right to claim paper or the proceeds of paper which was put in bank to be collected. When the holder places his paper in bank he usually does so in one of three ways: First. As a principal employing the bank as a mere agent for collection, in which case the restrictive indorsement 'For collection' is or should always be used, so that all subsequent holders may be advised of the bank's want of title. This is the form of indorsement generally used when the holder is not a customer of the bank. Second. As an avowed seller to the bank, in which case the indorsement is in blank, and the transaction a plain one. Third. As a customer having an account with the bank, in which case the restrictive indorsement is or is not employed, according to the relations established by agreement between the parties. If the bank treats the paper as a cash deposit, and allows the customer to draw against it in anticipation of the collection, the indorsement is generally in blank." In the case under consideration the draft was drawn by the Rogers Bros. Produce Company in favor of petitioner, and addressed to the defendants in error, and required no indorsement to make it the property of petitioner. The testimony of the cashier

of the bank is that the draft was paid for at the time by giving said produce company credit on their books; and there is no good reason assigned why he should make a misstatement of the facts, or that he has any interest whatever in the result. It is claimed that said cashier made contradictory or inconsistent statements in his deposition and the answer filed by him to the bill of discovery, but on examination it will be found that in his deposition he has reference to the amount deposited to the credit of said company, while in the answer he had reference to the amount of credit on the deposit account compared with the entire indebtedness of said produce company to the bank. There is no evidence in the case tending to show that said draft was received for collection only, and it was error to instruct the jury that if they believed such to be the case, they should find for the defendants in error.

As to the question raised by instruction No. 3, which was given at the instance of the defendants in error, it was immaterial whether the petitioner, under the circumstances shown in this case, applied the deposits of the produce company to the payment of said draft or not. While they may have had the right to do so, yet, if it failed to do so, it did not prejudice its rights as against attaching creditors of said produce company. Rogers Bros. Produce Company had transferred the property in the prunes for value to the petitioner, and it is clear that if the prunes were the property of the petitioner, at the time the attachment was sued out and levied, they could not be attached and sold for the liability of said produce company; but under the ruling in the case of *Dows* v. *Bank*, 91 U. S. 618, quoted above, petitioner had a complete right to hold said prunes as security for the acceptance and payment of said draft, and said instruction No. 3 was unwarranted.

The question presented in this case is not whether petitioner would have a right to recourse upon the Rogers Bros. Produce Company in the event it fails to recover the amount of said draft out of the proceeds of said prunes, nor as to the manner in which it may recover the amount paid for said draft in that event, but whether the petitioner, by reason of the assignment for value to it of said draft and

bill of lading, is entitled to hold the prunes against the claim asserted by the defendants in error under their attachment; and this question being settled, as I think, by the case of *Dows* v. *Bank, supra.* instructions Nos. 4 and 5 given at the instance of the defendants in error were erroneous, and should not have been given; and for reasons before stated instruction No. 6 was improper and should have been rejected. Upon this question, Schouler, in his work on Bailments and Carriers, in section 189, states the law thus: "The transfer of a bill of lading of a ship at sea, or the delivery of a warehouse key, have long been esteemed sufficient for legally transferring possession of the thing so symbolized. And so in modern times one's pledge by delivering bills of lading of goods on transit or way bills, whether inland or by water, usually suffice to make the pledgees' title good against the world." And in the next section the author says: "It is quite customary of late years for the consignee of goods which are on transit to pass his bills of lading over to some bank or capitalist by way of security for the discount of his paper. Such transfers are firmly sustained by American courts as amounting to a pledge of the goods themselves for the pledgor's paper indebtedness, and, whether the transit were by land or sea, valid on the score of constructive delivery as against both the pledgee and the public." The safety and facility which this rule of law affords has produced in good part the wide expansion of modern commerce. See, also, on this point, *Holmes* v. *Bailey,* 92 Pa. St. 57, where it is held that: "Where a bill of lading is attached to a draft as security for its payment, and transferred for a valuable consideration, it is an appropriation of the property contained in the bill, whether it is indorsed or not." See, also, *Holmes* v. *Bank,* 87 Pa. St. 525, where it was held that: "Where a bank discounted a draft with a bill of lading attached as security for its payment, and sent it to a correspondent for collection, the commission firm to whom the property was consigned refused to pay the draft, and afterwards received and sold the property, and applied the proceeds to an old debt due them by the consignor, held that, having notice of the draft and bill of lading before sale, they were informed

of the appropriation of the proceeds of sale, and could not apply them to an old debt of their own." This question was also before the Supreme Court of Massachusetts in the case of *Hathaway* v. *Haynes*, 124 Mass. 311, where it is held that : "Where a draft is drawn by the shipper of goods on a third party, and a bill of lading in which the shipper is named as consignee is indorsed in blank by him, and attached to the draft, and delivered to a bank discounting the draft as collateral security for the money advanced, such delivery transfers a special property in the goods to the bank ; and if the goods come wrongfully into the possession of a person, who sells them, and is summoned as trustee of the shipper in an action by another creditor, the bank may appear as adverse claimant, and has a better title to the proceeds of the goods than the attaching creditor." See, also, *Conard* v. *Insurauce Co.*, 1 Pet. 445. These cases appear to me to state correctly the law bearing upon the question as to the effect of the transfer of the bill of lading in the circumstances of the case under consideration.

Some questions were raised during the progress of the trial by objection to the ruling of the court upon the testimony offered, and they have been relied upon as errors; but I do not regard their determination as material in properly disposing of the main and material questions submitted in the record. There is however, another aspect of this case, which in my opinion, is entitled to great consideration, if not conclusive effect, in determining the proper conclusion in this case. The petitioner, in asserting its claim to the property in controversy, relies upon the sight draft accompanied by the assigned bill of lading, while the defendants in error rely solely upon their attachment lien. They do not claim the property as purchasers, as the record discloses the fact that they refused to receive or pay for it. The petitioner, by asserting its claim, disputes the validity of the attachment; and, if the attachment is irregular and invalid, the defendants in error have no claim to or lien upon the property or its proceeds. If the attachment was irregular, and improperly sued out, it was the duty of the court *ex officio* to quash it. *Mantz* v. *Hendley*, 2 Hen. & M. 308. The affidavit which was the foundation for the

order of attachment, in designating the amount which affiant believes the plaintiffs were entitled to recover, omitted the words "at the least," contained in the statute, and used no words equivalent thereto; and, as has been held by this Court in the cases of *Altmeyer* v. *Caulfield*, 37 W. Va. 847 (17 S. E. Rep. 409) and *Baking Co.* v. *Bachman*, 38 W. Va. 84 (18 S. E. Rep. 382,) said affidavit was fatally defective, and the attachment should have been quashed, and the property on which it was levied, or its proceeds, restored to petitioner.   The judgment complained of is therefore reversed, and the case remanded, with costs.

## ON REHEARING.

The foregoing opinion in this case was handed down on the 30th day of March, 1895, and on petition presented by the appellees a rehearing was ordered on the 2d day of May, 1895, and the cause resubmitted on the 7th day of June, 1895, at which time able and exhaustive arguments were presented by counsel for the respective litigants; but, after giving to the arguments presented our best consideration, we have reached the same conclusion.   It is contended by counsel for appellees that the Court had no right *ex officio* to quash the attachment, and, while I do not regard this question as material in the determination of this case, yet, as a majority of the Court agree with counsel for the appellees upon that point, I will say that in my opinion, where the only claim asserted by a party to property is by virtue of an alleged attachment lien, in a contest in regard to the validity of such claim the court has a right to inquire into the regularity of the attachment proceeding, and determine whether any lien has ever been established in pursuance of the requirements of the statute.   The appellant in this cause, in its petition, alleged that under and by virtue of the attachment issued in the action the prunes had been levied on, taken from the possession of the Baltimore & Ohio Railroad Company, and were then held by the sheriff of Ohio county; and that petitioner had such a claim to and interest in said property as entitled it to have the same released from such levy.   It may be pertinent just here to inquire by what authority said prunes were then

held by the sheriff of Ohio county.   There can be but one reply, and that is, by virtue of the order of attachment; and yet the petitioner alleged that it was entitled to have said property released from the levy of said attachment.   This surely was an assertion that its claim was superior to that claimed under the attachment, and with this assertion in the petition the court might inquire whether the attachment lien was valid, and binding on the property.   The sole claim to the property asserted by the appellees rests upon the validity of their attachment lien, and the petitioner claims that it has such a claim to and interest in said property as entitles it to have the same released from levy on the attachment.   If this assertion be true, even though the attachment should be formal, in all respects complying with the requirements of the statute, yet it does not constitute a valid lien as against the claim asserted by the petitioner, and it only seeks to dispute the validity of the attachment so far as its right to that property is concerned; and to that extent it appears to me the petition does dispute the validity or binding effect of the attachment.   It is, however, contended by counsel for defendants in error that the validity of the plaintiff's attachment was a conceded fact in this case, because the petitioner only stated a claim or interest of its own against the property which was attached, and did not dispute the validity of said attachment; that the principal defendant never made any effort to quash it, but, on the contrary, permitted judgment to go, and, more than a year having elapsed, it was then too late for it to file a new petition attacking the plaintiffs' attachment.    But when we refer to the order of court directing said sale it is seen that said prunes were sold by consent of parties (it may be presumed because the property was perishable) and it was expressly agreed upon the record that the sheriff should hold the proceeds of sale, as the property itself would have been held if unsold, until the further order of the court; and all questions as to the title to and ownership of the property thereby directed to be sold were reserved.   Now, what title had the defendants in error to said prunes save and except what they derived by virtue of the regularity of said attachment proceedings and

the validity of said attachment lien? And surely, if all questions as to title to said property were reserved by said order, said reservation did not apply solely to the title of the plaintiff in error, but also to all questions as to the claim or right of the defendants in error to dispute the claim of plaintiff in error. This reservation in the order would, as it appears to me, prevent the limitation of one year provided for in section 23 of chapter 106 of the Code from applying, for the reason that all of these questions were to remain open, as if the property had not been sold. It is however, contended by the defendants in error that no security for costs was given by the petitioner, and therefore it could not be heard to assert its claim; and the case of *Tappan* v. *Pease*, 7 W. Va. 682, is relied upon to sustain the position that it must appear affirmatively on the record that such security had been given before petitioner could be heard. In that case HAYMOND, P., in delivering the opinion of the Court, on page 687, said: "It has been suggested, however, that this court should presume that security was given in the court below. Appellate courts sometimes, under peculiar circumstances, will presume some things in support of judgments or decrees of inferior courts when they are sought to be reversed." In the case under consideration we are asked to presume against the correctness of the judgment. The judgment was in favor of the defendants in error, and, in accordance with the theory contended for by them, the court had no right to submit the questions raised by the petition to the jury until security for costs was given. The court however, did submit these questions, not only to one, but to two, juries; and after the petition was filed the defendants in error, by their counsel, consented that the property in controversy might be sold by the sheriff, and that he should hold the proceeds of such sale as the property itself would have been held if unsold, and that all questions as to the title to and ownership of the property be reserved. These questions were presented to a jury on the 1st day of May, 1891, and the same questions were presented to a jury on the 26th day of April, 1894, and the case heard for several days in succession, the parties being represented by able,

astute, and experienced counsel, who well knew that the statute provided that upon giving security for costs the court should impanel a jury to inquire into such claim; yet no suggestion was made that security for costs had not been given. Couple this circumstance with the facts that under the statute security for costs might be given before the clerk, and that nothing in the statute requires that it should appear affirmatively in the record that such security had been given, and my conclusion is that we would be warranted in presuming that the court below acted rightly, and required security for costs to be given before either of said juries were impaneled. Lawson, Pres. Ev., at page 34, says: "The maxim, '*Omnia Praesumuntur rite esse acta*,' finds perhaps its best application in sustaining the validity of judicial proceedings. They are presumed to be regular."

We may next consider whether the Rogers Bros. Produce Company, at the time said attachment was levied, had such interest or ownership in the property in controversy as could be attached for its indebtedness. Upon the question as to the effect of the transfer of a bill of lading Mr. Justice Bradley, in delivering the opinion of the court in the case of *Casey* v. *Caveroc*, 96 U. S. 477, says: "The difference ordinarily recognized between a mortgage and a pledge is that title is tranferred by the former and possession by the latter. Indeed, possession may be considered as of the very essence of a pledge; and, if possession be once given up, the pledge, as such, is extinguished. The possession need not be actual; it may be constructive—as where the key of a warehouse containing the goods pledged is delivered, or a bill of lading is assigned. In such case the act done will be considered as a token, standing for actual delivery of the goods. It puts the property under the power and control of the creditor. In some cases such constructive delivery can not be effected without doing what amounts to a transfer of the property also. The assignment of a bill of lading is of that kind. Such an assignment is necessary, where a pledge is proposed, in order to give the constructive possession required to constitute a pledge; and yet it formally transfers the title also. In such a case there is a union of two distinct forms of security—that of a mortgage and that

of a pledge ; mortgage by virtue of the title, and pledge by virtue of the possession." See Jones, Chat. Mortg. § 4.   Anderson, in his Dictionary of Law, under the word "Lading," says : "A bill of lading is a symbol of property, and, when properly indorsed, operates as a delivery of the property itself, investing the indorsee with a constructive custody which serves all the purposes of an actual possession, and so continues until there is a valid, complete delivery under and in pursuance of the bill of lading to the person entitled to receive the property. * * * In the hands of the holder, a bill of lading is evidence of ownership, special or general, of the property mentioned in it, and of the right to receive the property at the place of delivery."   Jones on Pledges, in section 229, says : "The delivery of a bill of lading is a symbolical delivery of the property represented by it.   The person who takes a bill of lading for a valuable consideration, whether this arises at the time or rests upon a previously existing debt, has the right to the property without taking actual possession of it, or doing any further act to perfect his title."   See *Grove* v. *Brien*, 8 How. 429. Also *Bank* v. *Logan*, 74 N. Y. 568, in which it is held that : "The bill of lading confers upon the person in whose favor it is issued or to whom it is transferred the title to the goods; and this although the transaction is not intended to give the permanent ownership, but to furnish security for advances of money or discount of commercial paper upon the faith of it."   See, also, *First Nat. Bank* v. *Northern Railroad*, 58 N. H. 203, in which the court held that "a common carrier by a railroad, who delivers goods entrusted to him for carriage without production of the bill of lading describing the goods, is liable in trover for their value to a *bona fide* holder of such bill, taken for value, before the delivery of the goods at destination."   Allen, J., delivering the opinion of the court, says : "The transfer of a bill of lading to a *bona fide* purchaser for value, or as security to one who makes advances on the goods described in the bill, entitles the assignee or pledgee to the possession of such goods, subject only to the lien of the carrier for freight, or to the claims of a consignee into whose possession the property may have come before transfer of the bill of lading"—

citing *Lickbarrow* v. *Mason*, 6 East, 21, note; *Walter* v. *Ross*, 2 Wash. C. C. 283, Fed. Cas. No. 17,122; *Ryberg* v. *Snell*, 2 Wash. C. C. 294, Fed. Cas. No. 12,189; *Winslow* v. *Norton*, 29 Me. 419; *Emery* v. *Bank*, 25 Ohio St. 360. "The delivery of the bill of lading takes the place of delivery of the goods, for no delivery of the latter is practicable at the time, and the symbolical delivery of the bill is sufficient to pass the title"—citing *Ricker* v. *Cross*, 5 N. H. 570; *Bank* v. *Stacey*, 4 Mass. 663; *Pratt* v. *Parkman*, 24 Pick. 46; *Gardner* v. *Howland*, 2 Pick. 601. "The bill of lading represents the property, and is transferred by delivery merely, without regard to indorsement or words of negotiability on its face; and by such transfer the assignee acquires the assignor's right in the property, and may maintain an action for its loss or conversion in his own name." If such were not the case, the goods *in transitu* would be liable to attachment at every railroad station between the point of shipment and the place of delivery where the shipper happened to owe a debt, and there would be no end to the impediments and obstructions thrown in the way of commerce. The doctrine is clearly stated by Betts, J., in The Mary Ann Guest, Olcott, 501 Fed. Cas. No. 9,197. He says: "For the convenience of commercial transactions, bills of lading have been allowed to become negotiable instruments, and upon the faith of them it is usual and customary for commission merchants to make advances. By such indorsement of the bill of lading the holder of it becomes, as against the world, the owner of the goods. *Conard* v. *Insurance Co.*, 1 Pet. 386; *Nathan* v. *Giles*, 5 Taunt. 558. The bill of lading transfers the property to the consignee, and it seems to be conceded that the assignment of it by the consignee by way of sale or mortgage will pass the property, though no actual delivery of the goods be made, provided they were then at sea. 2 Kent, Comm. 549; *McNeill* v. *Glass*, 1 Mart. (N. S.) 261. It is no defence to the claim of the consignee that the goods have been attached or seized by virtue of any judicial process. The contract of the carrier is that he will deliver the goods in good order and condition to the shipper or his assigns (the dangers of the seas only excepted). He thus guaran-

ties to protect the possession of the shipper and his assigns. He had the right of possession of the goods as against the sheriff, and could have interposed in the replevin suit, and had an immediate trial of the right of the sheriff to take them from his possession." In the case under consideration it must be constantly borne in mind that the attachment proceedings was against the Rogers Bros. Produce Company, and not against the petitioner (the First National Bank of Santa Barbara); and the question is whether the attachment could be levied upon the cargo of prunes as the property of the Rogers Bros. Produce Company at the time it was levied. Drake, in his valuable work on Attachments, in section 245, states the law on this question as follows: "A fundamental principle is that an attaching creditor can acquire no greater right in attached property than the defendant had at the time of the attachment. If, therefore, the property be in such a situation that the defendant has lost his power over it, or has not yet acquired such interest in or power over it as to permit him to dispose of it adversely to others, it can not be attached for his debt. Thus a chattel pawned or mortgaged is not attachable in an action against the pawner or mortgagor (citing numerous authorities). * * * A case of not infrequent occurence is that of goods being attached where the vendor of them to the defendant is entitled to exercise the right of stoppage *in transitu*, and exercises that right while the attachment is pending. In such case the principle announced in the opening of this section undoubtedly applies, and the vendor is not precluded by the attachment from exercising his right of stoppage, even though the goods may, by order of the court, have been sold. He is entitled to the proceeds in the hands of the court." These authorities, as we think, support the conclusion reached in the opinion to which the rehearing was allowed, both as to the instructions refused by the court when asked for by petitioner, and especially as to instructions 3, 4 and 6, and as to instructions 3, 4, 5, and 6 which were given at the instance of defendants in error.

At the time this attachment was levied the goods were still in the possession of the Baltimore & Ohio Railroad.

The First National Bank of Santa Barbara was the holder for value of the bill of lading, and was entitled to the goods until the draft accompanying said bill was paid; and under the authorities above cited said goods were not subject to the levy of an attachment, or to sale thereunder as the property of the Rogers Bros. Produce Company. Discarding, then, and omiting what has been said in the original opinion in regard to the regularity of the attachment proceedings and the duty of the court *ex officio* to quash it, my conclusion is that, however regular and formal in all respects the attachment proceedings may have been, the defendants in error had no right to attach the property at the time they did as the property of the Rogers Bros. Produce Company, or to subject it to sale for their claim.

For these reasons the judgment complained of must be reversed, with costs, and the cause remanded.