**F. L. SHAW CO. v. COLEMAN et al. (three cases). (Nos. 2453–2455.)**

(Court of Civil Appeals of Texas. Texarkana. Dec. 16, 1921. Rehearing Denied Jan. 5, 1922.)

**1. Carriers ⚖=55 — Interstate bill of lading held an "order bill" and "negotiable."**

A bill of lading for an interstate shipment "to F. L. Shaw Company, Paris, Texas, notify J. G. Coleman," was an "order bill" and negotiable within the meaning of U. S. Comp. St. §§ 8604a to 8604n, and the person to whom it was negotiated acquired title to the property shipped, and could convey to a purchaser in good faith for value.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Negotiable.]

**2. Carriers ⚖=83—Violation of duty under order bill of lading to deliver shipment without order.**

Carrier violated its duty under a bill of lading shipping "to F. Company, Paris, Texas, notify J.," when it delivered the shipment to J. without an order from F. Company; the bill being an "order bill," and negotiable under U. S. Comp. St. §§ 8604a to 8604n.

**3. Sales ⚖=234(8)—Title held to have passed under contract to dealer to whom shipment was delivered without payment of draft attached to bill of lading.**

Title *held* to pass under an "order bill" of lading negotiable under U. S. Comp. St. §§ 8604a to 8604n, where such bill was sent to a bank with a draft attached, and the shipment was delivered without payment of the draft, and the shipment could not be recovered from

innocent purchasers, in view of a dealer's contract tending to show that it was the intention that title should pass to the person to whom the shipment was delivered, when such shipment was delivered to the carrier.

Appeal from District Court, Lamar County; A. P. Dohoney, Judge.

Action by the F. L. Shaw Company against J. G. Coleman and Arnold Goode, and J. G. Coleman and Earnest McGlosson, and J. G. Coleman and B. W. Tinnin, respectively. Judgments for defendants, and plaintiff appeals. Affirmed in part, and reversed and rendered in part.

January 29, 1921, the F. L. Shaw Company, a corporation, of Dallas, commenced suit against J. G. Coleman and Arnold Goode, alleging that it was the owner and entitled to the possession of a certain Studebaker automobile, particularly described, of the value of $1,612, which Coleman and Goode had wrongfully obtained possession of. The prayer was for judgment for the restitution of the car, or, in the alternative, for its value. At the time said Shaw Company procured the issuance and levy of a writ of sequestration on the car, which Goode afterward replevied. Coleman's answer to the suit consisted of a general denial alone. Goode, in addition to such a denial, in his answer alleged that Coleman, under a contract with the Shaw Company, was engaged in the sale of Studebaker automobiles in Paris, where he maintained a salesroom for displaying the cars, and where he had possession of the car in question, and that he (Goode) purchased same, paying a valuable consideration therefor, relying on the fact, as he believed, that Coleman owned the car and had a right to sell it, and without any notice of any fact which in the least indicated to the contrary. In a supplemental petition the Shaw Company alleged that it purchased the car and two others from the Studebaker Corporation of America, which shipped same from Detroit, Mich., on an order bill of lading issued by a common carrier, which it forwarded with a draft for the price attached to a bank; that it (the Shaw Company) paid the draft, when the bill of lading was delivered to it, and thereby became the owner of the cars; that, having accepted an order from Coleman for the purchase of the cars, it drew a draft on him for the price thereof, which it attached to the bill of lading and sent through a bank in Dallas to a bank in Paris; that it thereby retained the title to the cars; that Coleman, without paying the draft, and without its consent, obtained possession of the cars and disposed of one of them to Goode; that in so obtaining the cars Coleman did not acquire title thereto, and could not and did not pass the title to the one in question to Goode.

The trial was to the court without a jury. It appeared from testimony he heard that the Shaw Company was the "state distributor" for the Studebaker Corporation, and "appointed dealers and made contracts with dealers throughout the Texas territory for the sale of Studebaker cars." On January 15, 1920, said F. L. Shaw Company, as such distributor, entered into an agreement with Coleman, in business in Paris, by the terms of which said Shaw Company granted to Coleman the right, during the continuance of the contract, to purchase for resale by Coleman automobiles supplies by said Studebaker Corporation. Coleman, at the time the agreement was executed, was to give the Shaw Company a written "car purchase order" on the form it provided therefor, for a sufficient number of automobiles to cover the requirements of his trade for the current and succeeding months, and thereafter, on or before the 15th day of each month, was to give the Shaw Company a like order covering his requirements for the succeeding month. Orders so given were to become a part of the agreement. On delivery of cars he ordered Coleman was to pay the Shaw Company in cash the Studebaker Corporation's regular current list prices, f. o. b. the cars at Detroit, less specified discounts. If the cars were shipped by carriers, the Shaw Company, at its option, was to make sight drafts on Coleman with bills of lading attached, which Coleman was to pay on presentation to him, and, if he failed to do so, was to pay interest on the amount of such drafts at the rate of 6 per cent. per annum from the date they were presented to the time when he paid same. Coleman was to purchase and keep a stock of two cars, and to keep on hand in good condition at least one car for "demonstration and show purposes." He was also to carry a stock of parts recommended by the Studebaker Corporation, not less than $950 in value. He was to pay all taxes on all automobiles and parts in his possession "or on railroad track for delivery to him." He was to maintain "a suitable salesroom and to provide a properly equipped repair and service station for repairing Studebaker automobiles." He was also "at his own expense to do local advertising devoted exclusively to Studebaker automobiles in leading newspapers and periodicals," and was "to solicit and canvass the trade diligently," and distribute the Studebaker Corporation's "printed and advertising matter to the best possible advantage." The Shaw Company was not to be liable to Coleman "for any loss or damage to automobiles, parts, or other goods while in transit." Its responsibility was to "cease upon delivery of goods to a carrier." Coleman was to "use the name 'Studebaker' conspicuously, for display purposes only," in connection with the sale of Studebaker auto-

mobiles. At the end of each week during the existence of the contract he was to forward to the Shaw Company "the names and addresses of all purchasers of Studebaker automobiles sold by him during such week, with the model and serial number of each automobile sold," and was to "respond promptly with all other information" which the Shaw Company might "from time to time require, including the names and addresses of all persons making inquiry of him relative to Studebaker automobiles, to the end that" the Shaw Company might, if it chose to do so, "forward circulars and other advertising matter to such prospects." Coleman was to use the Shaw Company's "regular agreement forms for all agreements or sales made with or to subdealers and retail customers for Studebaker automobiles." The agreement was to be construed as an entire and personal one, and Coleman was not to assign same or any rights thereunder without the Shaw Company's consent.

Using one of the Shaw Company's order forms, in which it was recited that, when accepted by said Shaw Company, it was to "be considered a part" of the agreement referred to above, Coleman, at a date not shown by the record, but prior to September 4, 1920, ordered three automobiles of the Shaw Company, same to be shipped "to F. L. Shaw Company, Paris, Texas, notify J. G. Coleman." The Shaw Company in turn ordered the cars of the Studebaker Corporation. The cars were delivered by said corporation to a carrier in Detroit, Mich., on the date last above stated, consigned, as shown by the bill of lading, to "order of the Studebaker Corporation of America, Paris, Texas, notify J. G. Coleman, Paris, Texas." The bill of lading contained a provision as follows:

"The surrender of this original order bill of lading properly indorsed shall be required before the delivery of the property."

—and a provision that:

"The owner or consignee" should pay "the freight and all other lawful charges accruing on said property."

Said corporation attached its sight draft on the Shaw Company in favor of a bank in Dallas for $6,058.07, its price for the automobiles, to the bill of lading, and forwarded same to the Dallas bank. The Shaw Company paid the draft September 16, 1920, and the bank by its indorsement thereon transferred the bill of lading to said Shaw Company. On the same day, to wit, September 16, 1920, the Shaw Company drew a sight draft in favor of said bank on Coleman for $6,595.31, the amount he was to pay for the automobiles. This draft was attached to the bill of lading and with it forwarded to the First State Bank of Paris, which received same September 17, 1920. The draft was never paid. The automobiles arrived at Paris, September 14, 1920, and on that day, without the Shaw Company's knowledge or consent, were delivered by the carrier to Coleman (who paid the freight) in violation of the instructions to it in the bill of lading. Coleman moved the automobiles to his salesroom in Paris and sold one of them to Earnest McGlosson September 15, 1920, another to appellee Goode September 18, 1920, and the other to B. W. Tinnin "about" September 18, 1920, each of whom bought in good faith, for value, and without notice of any right in appellant or any one else, except Coleman, to the cars.

On the pleadings and facts stated the trial court rendered judgment that the Shaw Company take nothing by its suit.

On the day, said January 29, 1921, the Shaw Company commenced its suit against Coleman and Goode, it commenced one against Coleman and McGlosson, who, as stated, purchased one of the cars, alleged to be worth $2,504, and a suit against Coleman and Tinnin, who, as stated, purchased the other one of the cars, alleged to be worth $2,448. The pleadings of the parties and the testimony heard in the two suits last mentioned, except as to the value of the cars, were not different from the pleadings and testimony in the suit against Coleman and Goode, stated above, except that in the McGlosson and Tinnin suits Coleman, who was not a witness in the Goode suit, testified that he "had been accustomed to getting cars" from the carrier who delivered the automobiles in question to him "without paying the drafts." "When the drafts were not here," he said, "the Shaw Company would release them. When the bill of lading was not here and I wanted to unload the cars, I would call them up over the phone, and Mr. Wharton [the Shaw Company's manager] would wire a release, and they drew on me for the amount time and again." The trials in the McGlosson and Tinnin cases were also before the court without a jury, and, as in the Goode case, resulted in judgments that the Shaw Company take nothing by its suits.

The questions made by the assignments are the same in each of the three appeals.

Spence, Haven & Smithdeal, of Dallas, for appellant.

J. S. Patrick and Moore & Hardison, all of Paris, for appellees.

WILLSON, C. J. (after stating the facts as above). In what is to follow the word "appellant" means the Shaw Company; the word "dealer," appellee Coleman; and the word "purchaser," appellees Goode, McGlosson, and Tinnin, respectively.

[1] The shipment being an interstate one as between the Studebaker Corporation and appellant, it may be conceded at once that

the bill of lading was an "order bill" and negotiable within the meaning of the federal act (sections 8604a to 8604n, U. S. Compiled Statutes), and that appellant, to whom it was negotiated, acquired such title to the automobiles as the Studebaker Corporation, who negotiated it and who was both the consignor and consignee named therein, "had or had ability to convey to a purchaser in good faith for value" (section 8604p).

[2] It may as readily be conceded that the carrier was without authority to deliver the automobiles except on the order of appellant, the owner thereof, and that it violated duty it owed to appellant when it delivered them to the dealer as it did, in the absence of such order by appellant and without its knowledge or consent.

[3] And it might also be conceded, if testimony in the record should be given the effect warranted by many authorities, that by such delivery neither the right of possession nor ownership of the cars passed to the dealer as between him and appellant. Such effect cannot be given that testimony, however, in view of the holding of the Supreme Court of this state in Robinson & Martin v. H. & T. C. R. R. Co., 105 Tex. 185, 146 S. W. 537.

In that case Robinson & Martin by telephone from Dallas ordered a boiler of the Erie City Iron Works in Houston, to be shipped to Gainsville. The iron works company delivered the boiler to the carrier, prepaying the freight and taking a bill of lading in which it was stipulated that the carrier should deliver the boiler at Gainsville to the iron works company's order. The names of the purchasers did not appear in the bill of lading, but it was sent, with a draft on them for the purchase price attached, to a bank, with instructions to deliver same to the purchasers when they paid the draft. The Supreme Court held that the title to the boiler vested in the purchasers when it was delivered to the carrier in Houston.

"The right of property," that court said, "passed to the purchaser when the particular boiler was designated, but the right of possession remained with the seller until the draft was paid."

If the Supreme Court meant, as we think we must assume it did, what the language it used indicates it did, then its ruling applied here requires us to hold that the title to the automobiles vested in the dealer when they were delivered to the carrier in Detroit, that thereafter only the right of possession as security for the payment of the purchase money was in the Studebaker Corporation, and that that right of possession for that purpose was all that passed to appellant as the transferee of the bill of lading. It follows, in that view, that the judgment should be affirmed so far as it is in favor of the purchaser; for a bona fide purchaser from one who has the legal title to the property and possession thereof, though his possession is wrongful, takes the title as against the person entitled to possession only, or whose right is that of a mere lienholder. McDonald v. Humphries, 146 S. W. 712; Rohrbough v. Leopold, 68 Tex. 254, 4 S. W. 460; 35 Cyc. 356.

If the Supreme Court in the case referred to (Robinson & Martin v. Ry. Co.) meant only to hold, instead, as the Galveston Court of Civil Appeals seems to have concluded it did (Lippman v. Produce Co., 184 S. W. 534), and as the United States Supreme Court held in Dows v. Bank, 91 U. S. 618, 23 L. Ed. 214, that shipping goods under an order bill of lading sent to a bank with a draft for the purchase price attached, the bill of lading to be held until the draft was paid, "did not of itself constitute and conclusively show an intention to withhold the passing of the title until the draft is paid," the ruling, in the facts of this case, the purchaser insists, would still require an affirmance of the judgment; for, he says, and we agree, the judgment involves a finding by the trial court that the parties intended the title to pass to the purchaser when the property was delivered to the carrier in Detroit; and, he says further, there was testimony to support such a finding. The testimony he refers to showed, he says, that "the automobiles," quoting from his brief, "were sold f. o. b. Detroit. Coleman paid the freight from Detroit to Paris. Under the terms of the contract denominated 'dealer's contract,' clause 7, Coleman was obliged to pay taxes on the automobiles while on the railroad track if taxes were leviable. Under the contract the distributor, Shaw Company, could or could not draw a draft for the purchase price at his option." We agree that the testimony established the facts stated, except the fact that the cars "were sold f. o. b. Detroit." With reference to that the testimony was that the prices the dealer was to pay for the cars were their price f. o. b. the cars at Detroit, and not that they were sold f. o. b. the cars there.

Keeping in mind the fact that the question presented is not one as to the dealer's right as against appellant to the possession of the cars at the time he sold them, nor one as to how strongly testimony before the trial court may have tended to show the intention of the seller and buyer to be that the title should remain in the former until the cars were paid for, but is one as to the sufficiency of testimony before the court to support the finding in question, we think it must be answered that there was testimony sufficient for that purpose.

The contract covering the dealer's purchase of the cars did not specify the place where they were to be delivered, unless the provision therein that the prices to be

charged were for the automobiles f. o. b. the cars at Detroit should be construed as meaning the delivery was to be at that point. If the provision meant that, and the delivery to the carrier in Detroit was a delivery to the dealer, the title passed to him then. If the provision did not mean that, then a place for their delivery was not specified in the contract, and a like result would follow; for, "where the contract is silent as to the place of delivery," said the court in Alexander v. Heidenheimer (Com. App.) 221 S. W. 942, "delivery to the carrier operates as delivery to the vendee and passes title to him." The shipment in the case just cited was not on an order bill of lading, as here, but, if it had been, it is not thought the ruling would have been different. In Glanzer v. Armsby Co., 100 Misc. Rep. 476, 165 N. Y. Supp. 1006, the shipment was on an order bill, notify the purchaser, as here, and it was held that on facts like those in this case it will be presumed, unless a different intention appears, that "the property in the goods passes to the buyer at the time of the delivery to the carrier." The court in so holding quoted from the opinion of the New York Court of Appeals in Sawyer v. Dean, 114 N. Y. 469, 21 N. E. 1012, as follows:

"The plaintiff by shipping in his own name was simply keeping the possession of the property, as he had a right to do, until it had been accepted and paid for by the defendant. By shipping in that manner he retained and kept the lien of possession as his security for the payment of the property. The effect of the contract was to transfer the title of the property from plaintiff's assignor to the defendant, subject only to the right of the assignor to retain possession until payment should be made, as long as no credit was to be given or had been provided by the terms of the agreement."

The fact that the dealer was to pay the freight on the automobiles also was of probative force on the question as to whether the intention was that the title to the cars should pass to the dealer when they were delivered to the carrier. 1 Mechem on Sales, § 741. So, we think, was the fact that the dealer was to pay taxes assessable on automobiles purchased by him while in the possession of the carrier. And to our minds the provision in the contract between the dealer and appellant that the latter should not be liable to the former "for any loss or damage," quoting, "to automobiles or parts or other goods while in transit, as distributor's [appellant's] responsibility shall cease upon delivery of goods to a carrier," tended to show that the intention was that the title should pass to the dealer when the property was delivered to the carrier; for, unless he then became the owner, he could not hold the carrier for such loss or damage (Asheboro Wheelbarrow Mfg. Co. v. Railway Co., 149 N. C. 261, 62 S. E. 1091), and, if he could not look to the dealer for compensation therefor, he would be without a remedy for same. We think the trial court had a right to conclude it was not the intention to place the dealer in that position. 24 R. C. L. 16.

Another view of the record which the purchaser insists warranted the judgment in his favor is that appellant was estopped as against him from asserting, if it was a fact, that title to the property was not in the dealer. The principle of law invoked is that—

"Where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over, the property, and innocent third parties are thus lead into dealing with such apparent owner, they will be protected." 1 Mechem on Sales, § 157; 24 R. C. L. 378.

As indicating that this case was within the rule, the purchaser points to provisions in the contract between appellant and the dealer, referred to in the statement above, showing the dealer was to provide and maintain a salesroom and a properly equipped repair and service station for Studebaker cars, keep a stock of two such cars on hand and at least one other for demonstration and show purposes, order in advance cars to supply his trade for the current and succeeding months, do local advertising of such cars and solicit orders for them, use the name "Studebaker" conspiciously in his business, furnish the names and addresses of persons to whom he sold cars, and information as to prospective purchasers, and carry a stock of parts for such cars as should be recommended by the Studebaker Corporation, of the value of not less than $950.

If, in addition to the facts stated, it appeared that the possession the dealer held of the automobiles in question was with appellant's consent, or was attributable to any fault or neglect on its part, we would agree it was estopped from claiming them as against the purchaser. But it appeared that appellant not only did not consent to the delivery of the automobiles to the dealer, but that same were delivered to him in violation of its instructions to the carrier. Therefore the case, with respect to the contention made, is within an exception or qualification of the rule the purchaser relies upon, which makes it inapplicable, where the title remains in the seller, when it was not due to his act or omission that the buyer was in possession of the property. 1 Mechem on Sales, § 158 et seq.; 24 R. C. L. 378. It is clear from the testimony that it was not due to any conduct of the appellant that the dealer was in possession of the automobiles. Appellant did everything it reasonably could have done to prevent the passing of the possession of the cars to the dealer before he paid for them, and the latter's possession of same clearly was wrongful and in defiance of appellant's rights.

No reason appears in the record for denying appellant the recovery it sought against the dealer, and we think the judgment is erroneous in that respect. It will be affirmed so far as it is in the purchaser's favor and reversed so far as it is in the dealer's favor, and judgment will be here rendered against him in appellant's favor for the amount of his indebtedness to appellant on account of the automobiles.