Bell, J.,
 

 dissenting. The conclusions reached by the majority in this case, in my opinion, are not warranted by the facts or the law.
 

 
 *245
 
 Clause 2, Section 10, Article I of the Constitution of the United States reads as follows:
 

 “No state shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: * *
 

 That provision as it relates to this case is a prohibition against the state laying imposts on imports.
 

 The fact that all of the goods here in question (with the possible exception of those coming from the Philippine Islands) are imports will admit of no dispute and so long as they remained imports the prohibition against their being subject to taxation by the state remained in full force and effect.
 

 The question then is: Were these goods still imports at the time the state declared they were subject to tax?
 

 The decisions are numerous upon the subject of when imported goods ceasa to be immune from state taxation. Generally speaking, it would seem that the immunity ceases, first, where the imports are sold after arrival in this country, and, second, where they are taken from the original package for sale or for use in a manufacturing process.
 

 It must be conceded that the power to construe the Constitution of the United States is reposed in the federal courts, and that the state courts are bound to follow their decisions.
 

 Probably the leading case upon the subject of
 
 state taxation upon imports
 
 is
 
 Brown
 
 v.
 
 Maryland,
 
 25 U. S. (12 Wheat.), 419, 6 L. Ed., 678, decided in 1827. Chief Justice Marshall wrote the opinion of the court.
 

 In that case the state of Maryland attempted to exact a license fee from persons engaged in the business of selling imports. The question presented was whether the exaction of the fee was within the prohibition contained in Clause 2, Section 10, Article I of the Constitution of the United States.
 

 
 *246
 
 In a lengthy and elaborate opinion the Chief Justice said in part:
 

 “From the vast inequality between the different states of the confederacy, as to commercial advantage-, few subjects were viewed with deeper interest, or excited more irritation, than the manner in which the several states exercised, or seemed disposed to exercise, the power of laying duties on imports. From motives which were deemed sufficient by the statesmen of that day, the general power of taxation, indispensably necessary as it was, and jealous as the states were of any encroachment on it, was so far abridged as to forbid them to touch imports or' exports, with the single exception which has been noticed. Why are they restrained from imposing these duties
 
 f
 
 Plainly because, in the general opinion, the interest of all would be best promoted by placing that whole subject under the control of Congress. Whether the prohibition to ‘lay imposts, or duties on imports or exports,’ proceeded from an apprehension that the power might be so exercised as to disturb that equality among the states which was generally advantageous, or that harmony between them which it was desirable to preserve, or to maintain unimpaired our commercial connections with foreign nations, or to confer this source of revenue on the government of the Union, or whatever other motive might have induced the prohibition, it is plain that the object would be as completely defeated by a power to tax the article in the hands of the importer the instant it was landed as by a power to tax it while entering the port. * * * ”
 

 The tax was condemned and held invalid. That case has been cited and followed for more than a hundred years.
 

 The state of Maryland in that case was represented by Mr. Taney who argued that the license fee was lawful. He later became Chief Justice of the United
 
 *247
 
 States and in 1847, as Chief Justice, he wrote the opinion in the
 
 License Cases,
 
 46 U. S. (5 How.), 504, 12 L. Ed., 256, in which he said in part:
 

 “I argued the case in behalf of the state [referring to
 
 Brown
 
 v. Maryland], and endeavoured to maintain that the law of Maryland, which required the importer as well as other dealers to' take out a license before he could sell, and for which he was to pay a certain sum to the state, was valid and constitutional; and certainly I at that time persuaded myself that I was right, and thought the decision of the court restricted the powers of the state more than a sound construction of the Constitution of the United States would warrant. But further and more mature reflection has convinced me that the rule laid down by the Supreme Court is a just and safe one, and perhaps the best that could have been adopted for preserving the right of the United States on the one hand, and of the states on the other, and preventing collision between them.”
 

 In the case of
 
 Waring
 
 v.
 
 Mayor,
 
 75 U. S. (8 Wall.), 110, 122, 19 L. Ed., 342, the Supreme Court for the first time decided that where the goods had been sold after entry into this country they were no longer imports and the state could levy a tax upon the goods.
 

 The decision in the
 
 Waring case
 
 has been followed ever since it was rendered.
 

 The Tax Commissioner bottomed his decision upon the conclusion that a sale occurred after the imports arrived in this country and, upon appeal, the Board of Tax Appeals affirmed that decision.
 

 The majority opinion of this court is bottomed upon a dual conclusion, first, that there was a sale after the goods arrived in this country, and second, that the goods were mixed with the general property in the state thereby destroying the immunity.
 

 If there was a sale of the goods after arrival in this
 
 *248
 
 country that would make an end to the contention of appellant. See
 
 Waring
 
 v.
 
 Mayor, supra.
 

 The proposition that courts will look through the form and to the substance of a transaction in order to determine the rights of the parties is so universally understood and accepted as to need no citation of authority.
 

 It should also be kept in mind that, generally speaking, any statute imposing a tax should be strictly construed against the state and in favor of the taxpayer.
 

 With these principles in mind a brief examination of the facts is necessary and important to determine, first, whether a sale took place after the imports reached this country, and, if no such sale took place, then second, whether the goods were so incorporated with the mass of property in this state as to destroy the immunity.
 

 The undisputed evidence, together with the stipulations of counsel, disclose these salient facts: That appellant bought the goods in question through five New York sales agencies representing foreign producers; that on some occasions the offer to sell came from one of the five agents, and on other occasions the appellant would contact the agent and make an offer to purchase at a given price; that often the contracts were made before the goods were in existence; that after appellant and the agent had agreed upon a price, called a landed price, which included all ocean freight charges, insurance, etc., from the point of origin, the agent would submit the offer to the producer and get confirmation thereof; that after the confirmation was received by the agent a written contract generally would be executed between the appellant and the producer and thereafter the goods were shipped; that the contracts were executed upon uniform written forms which had been in use for many years; that the form contract provided that the title to the goods was to
 
 *249
 
 remain in the seller until the purchase price was paid; that this provision as to title was never enforced by the producer and was by mutual consent waived by the parties; that before the goods were shipped they were put up in bales and generally were marked so as to identify them with the contract; that the appellant determined the steamship line upon which the goods were to be shipped and determined the port of entry; that as soon as the goods left the point of origin the appellant immediately was notified and received the declaration of the ship; that appellant was responsible for the goods the minute the contract was made and the appellant had the right to re-sell the goods while upon the high seas; that the goods were shipped upon a bill of lading consigned by the producer to a bank, the bill of lading containing directions to notify appellant and the agent; that the agent took up the bills of lading, paid the bank and then shipped the goods by rail to Xenia, Ohio; and that appellant was the importer.
 

 The producer reserved no control over the goods after 'they were loaded on ship at point of origin except, as stated, that the bill of lading was issued to the order of the bank, with directions to notify appellant and the agent.
 

 The title to the goods upon arrival in this country was either in the producer or the appellant. No one could seriously contend that the bank or the agent was at any time the owner of the goods.
 

 The rule seems to be that where goods shipped in interstate commerce are earmarked for a purchaser and shipped under a bill of lading to the order of a bank with directions to notify purchaser,
 
 the right of property passes to the' purchaser ivhen the particular property was designated, but the right of possession remained in the seller until the draft is paid.
 

 
 *250
 
 In
 
 Robinson & Martin
 
 v.
 
 Houston & T. C.
 
 Rd.
 
 Co.,
 
 105 Tex., 185, 146 S. W., 537, paragraph two of the •syllabus states:
 

 “Goods purchased were shipped by rail consigned to shipper’s order, and draft for the price sent through the banks with ball of lading attached. Held that the purchaser had title to support an action against the •carrier for delay in transportation occurring prior to his payment of the draft, though the right of possession up to such payment was^in the shipper.”
 

 That case involved a boiler and on page 187, the •court, speaking through Brown, C. J., said :
 

 “When the Erie City Iron Works sold the boiler to Robinson and Martin and delivered it to the railroad company at Houston,
 
 the title rested in the purchasers-,
 
 neither payment of the price nor actual delivery to the purchaser was necessary to pass the title.” (Cases cited.) See, also,
 
 Dow
 
 v.
 
 Bank,
 
 91 U. S., 618, 23 L. Ed., 214;
 
 F. L. Shaw Co.
 
 v.
 
 Coleman
 
 (Tex. Civ. App.), 236 S. W., 178.
 

 These are cases involving commerce between the states; however, it is difficult to discern any sound reason why the rule applied in interstate commerce cases, as to an order-notify bill of lading should not apply also to such bills of lading when used in foreign commerce.
 

 The contract between the producer and appellant was the sole reason for shipping these goods into this country. This record to me clearly demonstrates that it was the intention of the parties that title was to pass when the goods were placed on ship; that title did pass to appellant at that time; and that there was no sale of the goods after their arrival in this country.
 

 With regard to the second conclusion of the majority, it is admitted that these goods were in the original packages at the time the exemption was claimed.
 

 
 *251
 
 In
 
 Brown
 
 v.
 
 Maryland, supra,
 
 it is said:
 

 “It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state;
 
 but while remaining the property of the importer, in his warehouse, in the original form or package in ivhich it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution.”
 
 (Italics ours.)
 

 In the
 
 License Cases, supra,
 
 Mr. Chief Justice Taney said:
 

 “And while they are in the hands of the importer for sale, in the form and shape in which they were introduced, and in which they are intended to be sold, they may be regarded as merely
 
 in transitu,
 
 and on their way to the distant cities, villages, and country for which they are destined, and where they are expected to be used and consumed, and for the supply of which they were in truth imported.”
 

 Low
 
 v.
 
 Austin,
 
 80 U. S. (13 Wall.), 29, 32, 20 L. Ed., 517, decided in 1871, is a leading
 
 “original package”
 
 case. Mr. Justice Field, in delivering the opinion of the court, said:
 

 “The simple question presented in this case for our consideration is, whether imported merchandise, upon which the duties and charges at the custom-house have been paid, is subject to state taxation, whilst remaining in the original cases, unbroken and unsold, in the hands of the importer.
 

 “The decision of this court in the case of
 
 Brown
 
 v.
 
 The State of Maryland
 
 furnishes the answer to the question. # * *
 

 “The Supreme Court of California appears, from its opinion, to have considered the present case as
 
 *252
 
 •excepted from the rule laid down in
 
 Brown
 
 v.
 
 The State of Maryland,
 
 because the tax levied is not directly upon imports as such, and consequently the goods imported are not subjected to any burden as a class, but only are included as a part of the whole property of its •citizens which is subjected equally to an
 
 ad valorem
 
 tax. But the obvious answer to this position is found in the fact, which is, in substance, expressed in the citations made from the opinions of Marshall and Taney
 
 [License Cases,
 
 46 U. S. (5 How.), 504, 575, 12 L. Ed. 256 (1847)],
 
 that the goods imported do not lose their character as imports, and become incorporated into the mass of property of the state, until they have passed from the control of the importer or been broken up by him from their original cases. Whilst retaining their character as imports, a tax upon them, in any shape, is within the constitutional prohibition.
 
 The question is not as to the extent of the tax, or its equality with respect to taxes on other property, but as to the power of the state to levy any tax. If, at any point of time between the arrival of the goods in port and their breakage from the original cases, or sale by the importer, they become subject to state taxation, the extent and the character of the tax are mere matters of legislative discretion.” (Emphasis added.)
 

 This decision has never been questioned but has been approved and followed upon many occasions and is still the law of the land.
 

 The second part of the conclusion of the majority, as set forth in paragraph two of the syllabus, is to my mind contrary to the decisions of the United States Supreme Court upon this subject.
 

 The last question is whether the manila hemp from the Philippine Islands is entitled to protection as an import.
 

 The cases of
 
 Woodruff
 
 v.
 
 Parham,
 
 75 U. S. (8 Wall.), 123, 19 L. Ed., 382;
 
 Pittsburgh & Southern Coal Co.
 
 v.
 
 *253
 

 Louisiana,
 
 156 U. S., 590, 600, 39 L. Ed., 544, 15 S. Ct., 459; and
 
 Patapsco Guano Co.
 
 v.
 
 Board of
 
 Agriculture, 171 U. S., 345, 350, 43 L. Ed., 191, 18 S. Ct., 862, are authority for the proposition that an article cannot he an import unless it has been brought into this country from a country foreign to the United States.
 

 Was the Philippine Islands during the years 1938, 1939 and 1940 a foreign country?
 

 In
 
 Cincinnati Soap Co.
 
 v.
 
 United States,
 
 301 U .S., 308, 81 L. Ed., 1122, 57 S. Ct., 764, in discussing the Philippine Independence Act, the court said:
 

 “* * *
 
 Undoubtedly, these acts have brought about a profound change in the status of the islands and in their relations to the United States; but the sovereignty of the United States has not been, and, for a long time, may not be, finally withdrawn. So far as the United States is concerned, the Philippine Islands are not yet foreign territory. * *
 
 *”
 

 See, also, the case of
 
 Fourteen Diamond Rings
 
 v.
 
 United States,
 
 183 U. S., 176, 46 L. Ed., 138, 22 S. Ct., 59.
 

 The decisions in those cases persuade me that the manila hemp from the Philippine Islands was not protected as an import.
 

 In my opinion, therefore, the decision of the Board of Tax Appeals should be reversed and the cause remanded with instructions to allow the exemptions claimed upon the goods here in question except the manila hemp from the Philippine Islands.